1  CHARLES A. BONNER, ESQ.  SB# 85413
2  A. CABRAL BONNER, ESQ. SB# 247528
   LAW OFFICES OF BONNER & BONNER
3  475 GATE FIVE ROAD, SUITE 211
   SAUSALITO, CA 94965
4  TEL: (415) 331-3070
5  FAX: (415) 331-2738
   cbonner799@aol.com
6  cabral@bonnerlaw.com

7  Howard Moore, Jr., Esq. (SBN 55228)
8  MOORE & MOORE
   1569 Solano Avenue, #204
9  Berkeley, CA 94707
10 Tel: (510) 542-7172 / Fax: (510) 528-3024
11 Email: moorlaw@aol.com

12 David C. Anderson
   LAW OFFICES OF DAVID C. ANDERSON
13 591 Redwood Hwy., Bldg. 4000
14 Mill Valley, CA 94941-3039
   Phone: (415) 395-9898
15 Facsimile: (415) 395-9839
16 Email: cynthia@dcandersonlaw.com

17
18 ATTORNEYS FOR PLAINTIFF

19            UNITED STATES DISTRICT COURT

20         NORTHERN DISTRICT OF CALIFORNIA

21            SAN FRANCISCO DIVISION

22 ALISON COLLINS                      | Case No.:  3:21-cv-02272

23        Plaintiff,                   | COMPLAINT FOR DAMAGES:

24                                     | **FEDERAL CLAIMS:**
   vs.                                 | 1.  FIRST CAUSE OF ACTION
25                                     |     Deprivation of First Amendment
26 SAN FRANCISCO UNIFIED SCHOOL        |     Right of Free Public Concern Speech
   DISTRICT, CITY AND COUNTY OF SAN    |     In Violation Of 42 U.S.C. 1983
27 FRANCISCO; SCHOOL BOARD             | 2.  SECOND CAUSE OF ACTION
   COMMISSIONERS Jenny Lam, In Her     |     Deprivation of Liberty Without
28                                     |     Due Process Under the Fourteenth

COMPLAINT FOR DAMAGES

1

Individual Capacity; Faauuga Moliga In His Individual Capacity; Matt Alexander In His Individual Capacity; Kevin Boggess In His Individual Capacity; AND Mark Sanchez In His Individual Capacity and DOES 1-50, inclusive,

            Defendants.

Amendment In Violation of Civil Rights (42 U.S.C. § 1983)

3.   THIRD CAUSE OF ACTION
Deprivation of Property
Without Due Process In Violation of Fourteenth Amendment (42 U.S.C. 1983)

STATE CLAIMS:

4.   FOURTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress

5.   FIFTH CAUSE OF ACTION
Negligence Government Code
Section 815.2

6.   SIXTH CAUSE OF ACTION
Violation of Property Interest Under Skelly

7.   SEVENTH CAUSE OF ACTION
Retaliation in Violation of California Labor Code § 1102.5

8.   PUNITIVE DAMAGES

9.   REQUEST ORDER TO SHOW CAUSE WHY AN INJUNCTION SHOULD NOT ISSUE.

    JURY TRIAL DEMANDED

*"First they came for the socialists,*
*and I did not speak out—because I was not a socialist.*
*Then they came for the trade unionists,*
*and I did not speak out— because I was not a trade unionist.*
*Then they came for the Jews,*
*and I did not speak out—because I was not a Jew.*
*Then they came for me—*
*and there was no one left to speak for me."*
*Pastor Martin Niemöller*

COMPLAINT FOR DAMAGES

PLAINTIFF ALISON COLLINS alleges against Defendants as follows:

## INTRODUCTION

1. On March 24, 2021, DEFENDANTS drafted a "Resolution" to remove Commissioner PLAINTIFF ALISON COLLINS ("MS. COLLINS) from her position as Vice-President of the San Francisco School Board, and upon giving 24 hours' notice, on March 25, 2021, voted 5-2 passing that "Resolution", stripping PLAINTIFF ALISON COLLINS of her vice-president position and membership on all committees.

2. DEFENDANTS' illegal actions, in violation of MS. COLLINS' First Amendment Rights of free speech, were premised on a series of tweets published on December 4, 2016, nearly four and one-half years ago when MS. COLLINS was a private, non-governmental employee. The tweets are as follows:

> 1. Hey Twitter! Does anyone know about any news stories highlighting hate speech or bullying of Asian students? Please send them my way.

> 2. I'm looking to combat anti-black racism in the Asian community at at my daughters' mostly Asian Am school.

> 3. Many Asian Ss and Ts I know won't engage in critical race convos unless they see how they are impacted by white supremacy.

> 4.I grew up in mostly Asian Am schools and know this experience all to well. Many Asian Am. believe they benefit from the "model minority" BS.

> 5. In fact many Asian American Ts, Ss, and Ps actively promote these myths. They use white supremacist thinking to assimilate and "get ahead".

> 6.Talk to many
> @thelowell
>  parents and you will hear praise of Tiger Moms and disparagement of Black/Brown "culture".

> 7. I even see it in my FB timeline with former HS peers. Their TLs are full of White and Asian ppl. No recognition #BlackLivesMatter exists.

> 8. 2 [weeks]was ago, my mixed-race/Black daughter heard boys teasing a Latino about "Trump, Mexicans and the KKK." The boys were Asian- American.

9. She spoke up when none of the other staff did. The after-school counselor was Asian.

10. My best friend from school says she feels alone in the Chinese community. She feels ostracized when she speaks up against anti-black hate.

11. Where are the vocal Asians speaking up against Trump? Don't Asian Americans know they are on his list as well?

12. Do they think they won't be deported? profiled? beaten? Being a house n****r is still being a n****r. You're still considered "the help."

3.     Defendants, at all relevant times, were aware that, on November 15, 2016, SFUSD African American Parent Advisory Council ("AAPAC") co-chair Rionda Batiste appeared before the SFUSD Board Meeting and complained to the Board that the Board allowed parents from the education "elite" to speak disparagingly against Black, Brown and economically deprived children without objection. AAPAC co-chair Rionda complained that she was so offended that the Board allowed a "parade of speakers", White and Asian parents, to "verbally bashed" Black and Latino children", and "presenting negative narratives about our children and families". Ms. Batiste repeated "some examples" of the verbal bashing of Black and Latino children from the White and Asian parents: "Black and Latino children are not doing better; they are doing worse!" "Asian and White children should not be punished for their counter parts' inability to learn." "The higher performing cultures understand the importance of hard work and that is why they are performing better."

Ms. Batiste further complained: "I was extremely disappointed that throughout this entire process, no one from the Board, nor administration felt to deter these parents from expressing their divisive, implied as well as explicit racist remarks." "To allow these comments to be the only voices resignation in the room, without any response, nor attempt to express opposition to them, was a demonstration of a kind of micro-aggression and racism that our children experience on a daily basis while others sit on the side-line in silence… silence is just as hurtful as the racist comments uttered." "It's the home life. There is a problem at home for these students that are completely zoned-out because they are hungry are going through some kind of trauma at home. These were "hate filled evaluations of our children".

COMPLAINT FOR DAMAGES

Ms. Batiste concluded the "…Equity demands that the system assumes the role of advocating on their [children's] behalf, and "to urge the Board to openly promote a school system that guarantees true equity for all of our children rather than one that is designed to foster a sense of entitlement and an environment for the educational elite….We hope that the Board will continue to retain a math sequence that give all students access to the highest quality education available. We anticipate an outcome on this issue that delivers a clear message that equity, not equal treatment, will continue to be our goal and that our implicit or expressive racism, classism or elitism will not drive decision making in SFUSD." [1]

4.      DEFENDANTS, at all relevant times, knew that MS. COLLINS, like Ms. Batiste, was also advocating this message of eliminating racism against Black and Brown children in the school system. Rather than take actions to protect Black and Brown children from racist harassment and racist bullying, DEFENDANTS opted to "burn" the messenger, using a pretzel-twisted redirection of MS. COLLINS' seasoned social metaphors aimed at uniting all marginalized, colonized and racially oppressed people against racism and racial oppression.

5.      On March 20, 2021, MS. COLLINS apologized to all who felt hurt by her tweets:

"With anti-Asian bias on the rise in our communities, and the hate crimes committed in Georgia this week, it is especially important that we uplift and center Asian American communities. All Americans deserve to feel safe.

I am horrified by the hate crimes rising across the Bay Area. And I am pleased San Francisco officials have increased security and support in predominantly Asian American neighborhoods. As a Black woman, a mother, an educator and a fierce advocate of equity in our schools I utilize my social media platforms to speak out on race and racism. Even when these conversations are difficult in our very divided society.

A number of tweets and social media posts I made in 2016 have recently been highlighted. They have been taken out of context, both of that specific moment and the nuance of the conversation that took place. President Donald Trump had just won an election fueled by division, racism and an anti-immigration agenda. Meanwhile one of my daughters had recently experienced an incident in her school in which her Asian American peers were taunting her Latinx classmate

---

[1] https://www.youtube.com/watch?v=ZwVacmUZtf4

about "sending kids back to Mexico" and the KKK. It was a time of processing, of fear among many communities with the unknown of how the next four years would unfold.

And here we are today. Anti-Asian racism is not new, but the recent uptick in violence and bigotry against Asian-Americans is clearly connected to Trump and his racist tropes.

But whether my tweets are being taken out of context or not, only one thing matters right now. And that is the pain our Asian American brothers and sisters and siblings are experiencing. Words have meaning and impact. Trump showed us that clearly with his sowing of hate and pitting communities of color against one another for political gain. I acknowledge that right now, in this moment my words taken out of context can be causing more pain for those who are already suffering. For the pain my words may have caused I am sorry, and I apologize unreservedly.

What matters more than anything is showing up and supporting Asian American communities and victims of hate crimes. Let me be clear: I stand with the Asian American community against acts of violence. I have spoken with leaders in the Asian American community over the last 24 hours and I acknowledge the pain they are feeling.

6.    Again, on March 23, 2021, MS. COLLINS publicly apologized during a Board of Education Meeting. She endured a barrage of disparaging remarks for half an hour of the meeting. DEFENDANTS knew that protecting Black and Brown children from racist bullying and racist harassment was the motivation and advocacy in MS. COLLINS' tweets

7.    DEFENDANTS, ignoring the call to protect our children, presently painfully suffering the slings and arrows of outrageous racism, harassment, and discrimination, mobilized and rallied elected officials against MS. COLLINS.

8.    "Mayor Breed calls for S.F. school board member to resign over racist tweets directed at Asian Americans. In an unprecedented move, San Francisco's top elected officials, including the mayor, state legislators and nearly all supervisors, including several who had served on the school board when MS. COLLINS and Ms. Rionda Batiste

made their pleas in 2016, called Saturday for a school board member to resign over racist tweets she posted in 2016 directed at Asian Americans. 'We are outraged and sickened by the racist, anti-Asian statements tweeted by school board Vice President Alison Collins that recently came to light," 22 current and former elected officials said in a statement Saturday. "No matter the time, no matter the place, and no matter how long ago the tweets were written, there is no place for an elected leader in San Francisco who is creating and or/created hate statements and speeches.'"

9.     DEFENDANTS, and each of them, unsatisfied with MS. COLLINS's apology, demanded that she resign from the Board as a prerequisite for a "restorative practice" discussion and "atone" for her comments. When MS. COLLINS refused to resign her elected position as a commissioner, DEFENDANTS lit their torches, sprinting to judgment in twenty-four hours, with less due process than given to victims of the Malleus Maleficarum.

10.     On March 25, 2021, DEFENDANTS passed their illegal "Resolution", ignoring the United States Constitution they swore under their oath of office to uphold and defend, and turned a blind eye to the First Amendment, providing: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." DEFENDANTS, at all relevant times, knew the First Amendment is applicable to the States under the provisions of the Fourteenth Amendment.

11.     DEFENDANTS' "Resolution" states:

> For Adoption on Suspension of the Rules at First Reading
> Subject: Resolution No. 213-25A1
> Assertion of No-Confidence
> - Commissioners Jenny Lam and Faauuga Moliga
> WHEREAS: Elected officials are community leaders, and students and their families look to them for guidance; and
> WHEREAS: The inflammatory statements made by Commissioner Collins towards the Asian American community in 2016 perpetuate gross and harmful stereotypes and leave no room for nuance or potential misunderstanding; and,

WHEREAS: Our relationship with elected officials must be predicated on mutual respect, and when our elected officials falter, we are faced with the difficult decision of how to hold them accountable; and

WHEREAS: When the social media comments resurfaced, what mattered most was that she, as a leader and elected official, accept responsibility and atone for the trauma inflicted on the community by her words; and

WHEREAS: Although Commissioner Collins has acknowledged that her words may have caused pain, her public statements to-date have fallen short of sincere recognition of the harm she has caused and Vice President Collins does not seem to take meaningful responsibility for her actions.

THEREFORE, BE IT RESOLVED: That on behalf of the 54,000 thousands of students in the San Francisco Unified School District, the Senior Administrative Staff, the elected officials representing all levels of San Francisco government who have requested that Commissioner Collins resign, the Commissioners of the San Francisco Board of Education have lost confidence in Commissioner Collins and her ability to focus on the pressing needs of the district at this time; and

FURTHER BE IT RESOLVED: That should Commissioner Collins not resign, the San Francisco Board of Education moves to remove her from her leadership position as Vice President and from all committees of the San Francisco Board of Education for the duration of her term; and

BE IT FURTHER RESOLVED: That the focus of the San Francisco Board of Education is the equitable re-opening of schools for our students, the health and safety of our faculty, staff, administrators, students, and families, and ensuring the financial stability of the district. [Emphasis added]

Special Meeting

3/25/21

12.    DEFENDANTS' "Resolution" was, and still is, "abridging the freedom of speech" of MS. COLLINS, causing injuries, harm and damages to MS. COLLINS as far and wide as infinity of the internet's world wide web.

13.    DEFENDANTS' "Resolution" admits in its omission that DEFENDANTS' adverse action against MS. COLLINS was not based on any acts or conduct by MS. COLLINS as a public official, or which were improper as a vice-president and committee member.

14.    This Complaint seeks an Order to Show Cause why an injunction should not issue, restoring MS. COLLINS to her rightful position as vice-president and to each of the committee assignments she enjoyed, and for money damages in proportion to the harm DEFENDANTS caused.

COMPLAINT FOR DAMAGES

**PARTIES**

15.   PLAINTIFF ALISON M. COLLINS is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

16.   DEFENDANT SAN FRANCISCO UNIFIED SCHOOL DISTRICT, CITY AND COUNTY OF SAN FRANCISCO (hereinafter "SFUSD" or "EMPLOYER") is a governmental entity.

17.   SCHOOL BOARD COMMISSIONER Jenny Lam, sued In Her Individual Capacity, is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

18.   SCHOOL BOARD COMMISSIONER Faauuga Moliga, sued In His Individual Capacity, is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

19.   SCHOOL BOARD COMMISSIONER Matt Alexander, sued In His Individual Capacity, is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

20.   SCHOOL BOARD COMMISSIONER Kevin Boggess, sued In His Individual Capacity, is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

21.   SCHOOL BOARD COMMISSIONER Mark Sanchez, sued In His Individual Capacity, is an adult natural person who is and was, at all times relevant to this Complaint, a resident of San Francisco County, State of California.

22.   PLAINTIFF is informed, believes, and thereon alleges that at all relevant times, each DEFENDANT was an employer, was a principal, managing agent, partner, joint venture, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other DEFENDANTS, and was engaged with some or all of the other DEFENDANTS in a joint

enterprise, and bore such other relationships to some or all of the other DEFENDANTS so as to be liable for their conduct with respect to the matters alleged in this complaint.

23.     PLAINTIFF is informed, believes, and thereon alleges that each DEFENDANT acted pursuant to and within the scope of the relationships alleged above, and that at all relevant times, each DEFENDANT knew or should have known about, authorized, ratified, adopted, approved, controlled, and/or aided and abetted the conduct of all other DEFENDANTS. As used in this complaint, "DEFENDANT" means "DEFENDANTS and each of them," and refers to the DEFENDANTS named in the particular cause of action in which the word appears.

24.     At all times mentioned herein, each DEFENDANT was the co-conspirator, agent, servant, employee, and/or joint venture of each of the other DEFENDANTS and was acting within the course and scope of said conspiracy, agency, employment, and/or joint venture and with the permission and consent of each of the other DEFENDANTS.

25.     PLAINTIFF is informed, believes, and thereon alleges that at all times mentioned in this Complaint, DEFENDANTS were the agents and employees of their CO-DEFENDANTS, and in doing the things alleged in this Complaint were acting within the course and scope of their agency and employment and acted in such a manner as to ratify the conduct of their CO-DEFENDANTS.

## JURISDICTION AND VENUE

26.     PLAINTIFF brings this action pursuant to the laws of the United States of America. Jurisdiction is founded upon 28 U.S.C. § 1331, as this case involves federal questions of law.

27.     Venue is proper in this judicial district because PLAINTIFFS' injuries, damages and harms, including the violation of PLAINTIFF'S civil rights, occurred in this judicial district.   Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in this judicial district. DEFENDANTS are subject to suit in this Judicial District.

COMPLAINT FOR DAMAGES

**DOE DEFENDANTS**

28.     PLAINTIFF does not know the true names and capacities, whether individual, corporate, associate, or otherwise of DEFENDANT DOES 1 through 50 inclusive, and therefore sues these DEFENDANTS by such fictitious names. PLAINTIFF will seek leave to amend her complaint to allege their true names and capacities when the true names and capacities have been ascertained.

**RESPONDEAT SUPERIOR**

29.     All the described conduct, acts, and failures to act are attributed to agents and managing agents of DEFENDANT SFUSD. Said acts, conduct, and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the course and scope of his or her employment and agency.

30.     Each DEFENDANT, at all relevant times, was acting as the agent and co-conspirator of the other, and each endorsed, ratified, encouraged, agreed with, and took overt acts to carry out and accomplish the illegal conduct, activities and schemes alleged herein. All illegal conduct by managing agents was endorsed, ratified, encouraged and agreed to by each DEFENDANT and was foreseeable, and DEFENDANTS, and each of them, had prior knowledge of said illegal conduct, rendering DEFENDANT EMPLOYER vicariously liable. DEFENDANTS are individually liable for the acts and omissions of each other, based on the facts that each DEFENDANT endorsed, ratified, encouraged, conspired and agreed to the illegal conduct as herein alleged.

31.     DEFENDANT SFUSD's Executive Leadership Team and Board Members, and each of them, intentionally, willfully, and negligently failed to provide any oversight over DEFENDANT SFUSD and its managing agents to ensure compliance with all Federal and State laws, including, but not limited to, laws mandating that employers refrain from retaliating against employees who participate in protected activity.

32.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

33.     PLAINTIFF has exhausted administrative remedies by filing a Tort Claim pursuant to Government Code Section 910.

COMPLAINT FOR DAMAGES

34.    WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

35.    Each and every wrongful, injurious, intentional, willful, discriminatory, harassing act and failure to act by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain. Thus, the Workers' Compensation exclusive remedy set forth in California Labor Cod § 3600 et seq. will not preempt or bar PLAINTIFF'S right to recover for damages set forth herein.

## DAMAGES
**"A Good Name is Rather to Be Chosen Than Great Riches,**
**And Loving Favour Rather Than Silver and Gold."** Proverbs 22:1 KJV

36.    As a direct and legal result of DEFENDANTS' conduct as set forth herein, PLAINTIFF has suffered, and continues to suffer, substantial losses in earnings, significant loss of reputation, severe mental, and emotional distress, humiliation, loss of enjoyment of life, misery, inconvenience, anxiety, discomfort, fear, and professional injury, damage to self-image, damage to career, injury to spiritual solace, pain, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, embarrassment and anguish, all to her economic and non-economic damage in an amount according to proof.

37.    DEFENDANTS reckless, intentional, and malicious slanderous comments have caused, and is continuing to cause clear and present danger, harm, and injuries to Ms. Collins, her husband and children. DEFENDENTS false narrative and assertion that Ms. Collins comments imploring Asian Americans to resist oppression as "racist" has generated this ongoing and intensifying hostility, threats and damage to Ms. Collins reputation and threatening her and her family's physical well-being. Contrary to the customary practice of refraining from using an individual's name during public comment, DEFENDANTS refused to honor this practice during the half of an hour of public comment directed at Ms. Collins during which DEFENDANTS permitted free slanderous comments calling Ms. Collins a "racist." DEFENDANTS incited one member from the public to vent: "

COMPLAINT FOR DAMAGES

38.     DEFENDANTS SCHOOL BOARD'S BIG LIE that MS. COLLINS was racist against Asians in the current, continuing, and escalating national environment of hate crimes against Asian has generated worldwide media repetition of the DEFENDANTS SCHOOL BOARD'S BIG LIE, causing irreparable damages to MS. COLLINS. MS. COLLINS good name and stellar excellent reputation has been irretrievably tarred in the following media:

(1)  New York Times - In San Francisco, Turmoil Over Reopening Schools Turns a City Against Itself

(2)  Wall Street Journal - San Francisco's Anti-School Board

(3)  LA Times - They made Anti-Asian Comments, Now What?

(4)  LA Times - Elected Leaders Call for San Francisco School Board Member to Resign after 2016 "Racist" Tweets.

(5)  New York Times - California is Making Liberals Squirm

(6)  Tyler Morning Telegraph - Other Voices: They Made Anti-Asian Comments. Now What?

(7)  ABC 7 Bay Area: SFUSD Board VP Responds to Tweets Targeting Asian Americans

(8)  NY Post - SF Schools Official Refuses to Quit of Racist Tweets

(9)  KCBS - Calls for Resignation Continue for SF School Board's Vice President After Racist Tweet Discovered

(10)      NBC Bay Area - Calls Increase for SF School Board Member to Resign for Controversial Tweets

(11)      KPIX 5 - CBS Bay Area - San Francisco School Board Facing Demands Over VP's Years-Old  Tweets, Changes to Lowell HS Admissions Policy

(12)      CBS 17.com - San Francisco School Board's Latest Crisis Latest Tweets

COMPLAINT FOR DAMAGES

(13)     Daily Beast - Top Ten Right Now; #1 San Francisco School Board Ditches VP for Accusing Asian Americans for Using "White Supremacist Thinking"

(14)     Westport News - SF School Board Removes Alison Collins as Vice President over Racist Tweets

(15)     National Review - San Francisco School Board Member Stripped of Position Over Anti Asian Tweets

(16)     CA Globe - SF School Board to Vote on Removing VP Alison Collins of All Titles, Responsibilities

(17)     CA Globe - SF School Board VP Alison Collins faces continued backlash following uncovering of racist tweets

(18)     ABC 7 - DEMANDS INCREASE FOR SF SCHOOL BOARD'S ALISON TO RESIGN AFFER OFFENSIVE TWEETS

(19)     Fox News - SF School Official Criticized for Tweeting Racial Slur Accusing Asians of Using "White Supremacist Thinking"

(20)     KRON 4 - San Francisco School Board Members Proceed to Remove VP Over Racist Tweets

(21)     SF Gate - San Francisco School Board Member Alison Collins Used Slur to Describe Asian Americans in Tweets

(22)     Mission Local - The Strange and Terrible Saga of Alison Collins and Her Ill-Fated Tweets

(23)     KPIX 5 CBS Bay Area - San Francisco Board of Education Votes to Remove Allison Collins As VP Over Racist Tweets

(24)     SF Chronicle - SF School Board Votes No Confidence in Commissioner Over Racist 2016 Tweets

(25)     ABC7 - SF School Board Strips Alison Collins from VP Title over Offensive Anti Asian Tweets

COMPLAINT FOR DAMAGES

(26)     Newsweek - What Alison Collins Tweets Said as San Francisco School Board VP Removed

(27)     ABC7 Bay Area - SFUSD Board Removes Alison Collins from VP Role over Offensive Tweets Aimes at Asian Americans

(28)     NY Post - San Francisco Schools Oust Vice President for "Harmful" Tweets About Asians

(29)     SF Chronicle - What Split on SF School Board Over Racist Tweets Means for District: "Crisis of Governance"

(30)     SF Chronicle - San Francisco School Board Member Criticized for Racist Tweets in 2016 Aimes at Asian Americans

(31)     SF Chronicle - SF School Board to Hold No-Confidence Vote on Commissioner Over Racist 2016 Tweets

(32)     SF Chronicle - SF School Board Approves No-Confidence Vote on Commissioner on Racist 2016 Tweets

(33)     SF Chronicle - Public Weighs in on Racist Tweets on SF School Board Member Live Updates: San Francisco School Board Meets in Wake of Controversy Over Racist Tweet

(34)     SF Chronicle -  SF Top School District Officials Condemn School Board Member for Racist Tweets

(35)     SF Chronicle - SF Mayor Calls for School Board Member to Resign Over Racist Tweets Directed at Asian Americans

(36)     SF Chronicle - Mayor Breed Calls for SF School Board Member to Resign Over Racist Tweets Aimed at Asian Americans

(37)     SF Chronicle - SFUSD School Board Member Criticized for Racist Tweets in 2016 Aimed at Asian Americans

(38)     MSN Microsoft News - SFUSD Board Members Remove Alison Collins from Her Role as VP

COMPLAINT FOR DAMAGES

(39)     Daily Mail - San Francisco School Board Member Refuses to Resign for Her 2016 Tweets Calling Asian Americans "House N****rs" Who Embrace "White Supremacist Thinking to Get Ahead"

(40)     Daily Mail - San Francisco School Board Strips Vice President of Her Leadership Title and Removes Her From All Committees Over 2016 Tweet Calling Asians "House N****s" - But She STILL Refuses to Resign

(41)     Daily Mail - Hundreds of Parents of Students Dial in to San Francisco School Board Meeting to SLAM Member for "Disgusting" 2016 Tweet Calling Asians "House N****s" - But She STILL Refuses to Resign

(42)     Yahoo News National Review - SF School Board Members Accused Asians of Using "White Supremacy" to "Get Ahead"

(43)     *Australian News Review* - San Francisco School Board Vice President Stripped of Leadership Title Over Racist Tweets from 2016

(44)     AsAm News - Resignation of SF School Board Demanded Over Tweets

(45)     The Washington Times - San Francisco Schools Official Blasting Asian Americans Taken Out of Context

(46)     School board member faces calls to resign over anti-Asian slurs in 2016 tweets.

(47)     School board members move to strip Alison Collins of titles, committee positions

(48)     School board strips Alison Collins of titles, committees in vote of no confidence

## **GENERAL ALLEGATIONS**

39.     DEFENDANT SAN FRANCISCO UNIFIED SCHOOL DISTRICT, CITY AND COUNTY OF SAN FRANCISCO, through DEFENDANT Employer's managing agents, discriminated and retaliated against PLAINTIFF for engaging in protected activity, as a private citizen in excess of four years before she was elected through the democratic

COMPLAINT FOR DAMAGES

process to the Board of Commissioners. PLAINTIFF'S speech was a matter of public interest and public concern and specifically addressed the issues of "Bullying" and "Harassment" of Black and Brown children by other students in a predominately Asian American school. Plaintiff was speaking as a private citizen and on behalf of herself and other similar situated Black and Brown parents.

40. DEFENDANT SFUSD'S Board of Education is comprised of seven members, elected at large to serve four-year terms. It is subject to local, state, and federal laws. The Board determines policy for all public schools, from PRE-K through twelfth grade, in the San Francisco Unified School District, City and County of San Francisco.

41. DEFENDANT Board of Education is responsible for establishing educational goals and standards; approving curriculum; setting the district budget, which is independent of the city's budget; confirming appointment of all personnel; and approving purchases of equipment, supplies, services, leases, renovation, construction, and union contracts. In order to manage the day-to-day administration of the district, the Board of Education appoints HIRES a Superintendent of Schools.

## STATEMENT OF FACTS

42. Defendants, at all relevant times, were aware that on November 15, 2016, SFUSD African American Parent Advisory Council ("AAPAC") co-chair Rionda Batiste appeared before the SFUSD Board Meeting and complained to the Board that the Board allowed parents from the education "elite" to speak disparagingly against Black, Brown and economically deprived children without objection.

43. At all relevant times, DEFENDANTS, and each of them were aware that the next day, Wednesday, November 16, 2016, MS. COLLINS emailed a complaint against Asian boys bullying a Mexican Boy with "racist jokes". She wrote:

44. Dear Mr. Wong [DEFENDANT SFUSD Assistant Superintendent] and Ms. De Arce, [DEFENDANT SFUSD Manager], FRANCISCO MIDDLE SCHOOL

COMPLAINT FOR DAMAGES

This email is a follow-up on our recent conversation. I want to ensure it gets documented so you can share it with others in an effort to support our students and school.

I just picked up my daughter Sofia from the Beacon afterschool program. She reported there were some Asian boys making "racist jokes" (her words) about Trump, Mexicans and the KKK during her Xtreme Builders club. Sofia told me the Asian students were directing their jokes at a Latino boy. (Sofia and the boy were the only non-Asian children out of about 10 students.) She was worried that by leaving early, she would leave him to be teased on his own.

After hearing this, I immediately told the afterschool director, Ed Cheveres, and then took Sofia back to the club to get more information. When I brought it up with Beacon staff member Calvin, in front of the children they all confirmed it was true.

I could tell it had not been properly addressed because one child continued playing his electronic game and a few others chuckled. I asked for everyone's attention with Calvin's permission. I calmly and seriously explained I was upset by what I had heard. I shared that the KKK killed black people, and that being Mexican is something to be proud of, not something to be teased about. I also explained that after Trump was elected many people are justifiably scared because they are families worried about being separated due to deportation.

I explained sometimes we laugh when we are uncomfortable. Nonetheless, these are not joking matters. I explained I have had friends who have been teased for being Asian. We can all be teased for who we are, but this is not funny teasing, and we need to help each other feel safe and stand up for one another. I said no one has to say anything now, but it is important for club members to talk about. I said if anyone wanted to share anything they could. The Latino boy told the group his father is Mexican, undocumented and has a criminal offense. (Which broke my heart.) He said he heard the teasing and decided not to respond because he knew it was people being stupid. I told him no one should have to deal with that, and said I was impressed with how he handled things.

Calvin is a very nice young man. He allowed me to speak and seemed supportive (and frankly glad) that I addressed these issues with

students. Nonetheless, it is still unresolved. Calvin mentioned he usually waits until the end of the club to talk with students about their behavior. I informed him that these types of things are very serious and need to be addressed immediately. When racial or ethnic jokes happen "everything needs to stop so we can talk about it." He agreed.

I stated I did not feel it was resolved and asked when they might do Restorative Practices around this. Calvin didn't seem to know when this could happen before next Wednesday. (Now I am realizing that can't even happen because of Thanksgiving break.) This was not acceptable to me, so at a minimum I suggested everyone could write a letter about their feelings about what happened and asked if Calvin could follow up. (They agreed.)

This incident is another example of the things we have been talking about on a daily basis at FMS. There is racial teasing, slurs and derogatory language outside of the classroom and it is hurting kids.

On the plus side, staff is very caring and wants to do something, yet is not prepared to address this type of behavior. I am still very upset to think if Sofia hadn't spoken up, and if I hadn't gone back, students might have gone home with the understanding that this type of joking was OK. Additionally, had I been another type of parent, this could easily have escalated into a student-parent conflict.

Please share this email with appropriate staff and let me know how the Beacon and FMS plan to address it. As we discussed, it would also be helpful to understand how all non-teaching/counseling staff (including security staff, office staff, e.g.) will be supported in learning skills to address this type of behavior in the future.

Additionally, while I am very impressed with the work going on with the PBIS, RTI and PAX programs, there are clearly gaps in district support of school-wide conversations with students that connect slurs, micro-agressive behavior and teasing to social justice and equity. I look forward to working with site staff to address immediate issues at FMS and hope this work may inform the creation of more systems, structures and resources to support these important conversations across all our schools.

Thank you again for your responsiveness and support. I look forward to hearing next steps and working with you through these challenges.

COMPLAINT FOR DAMAGES

Best,
Ali
Alison M. Collins, M.Ed
SF Public School Mom

45.     DEFENDANTS, at all relevant time, knew that on Nov 30, 2016, MS. COLLINS had complained to Principal Patricia Theel, Principal at Francisco Middle School:

46.     "Ms. Vogel and Ms. Theel, On October 21, my daughter Gemma was called a b**ch in the attendance office and nothing was done to address rampant verbal bullying and physical safety concerns at the school…. I am requesting the district address the numbered issues at the top of this email. This is in addition to remedying the safety and security concerns at FMS cited in previous emails based on a lack of staffing, lack of supervision and lack of staff training. Finally, I'd like district leadership to tell me…"What is FMS's plan to systematically engage with students, families and teachers in ongoing and meaningful ways, to address the hate speech and racialized teasing at our school?"" [Emphasis added]

47.     DEFENDANTS, and each of them, embarked on a plan to discredit MS. COLLINS because of her speech and advocacy for African American and Latino parents in efforts to achieve educational equity for all children of minority communities. MS. COLLINS and other parents of minority students demanded more admissions into the prestigious Lowell High School, where African American and Latino students are grossly underrepresented. In DEFENDANTS' zeal to silence MS. COLLINS' advocacy for increased admission in Lowell High and additional benefits for minority students, DEFENDANTS launched a scorched earth search for evidence to silence MS. COLLINS, including raiding the Twitter account of MS. COLLINS.

48.     On March 18, 2021, DEFENDANTS notified MS. COLLINS that there are social media posts alleging she and the Board of Education were anti-Asian.

49.     On March 19, 2021, a San Francisco Reporter, Jill Tucker, contacted MS. COLLINS, inquiring about her 2016 tweets.

COMPLAINT FOR DAMAGES

50.     On March 19, 2021, a San Francisco Reporter, Jill Tucker, published a Chronicle Article calling the tweets "racist".

51.     On March 19th Commissioner Jenny Lam called Ms. Collins to discuss the tweets. Ms. Collins offered Ms. Lam the opportunity to have an open discussion about the tweets. Ms. Lam declined this offer and threatened that if Ms. Collins did not resign, "things will get messy." She later posted a statement on social media that Ms. Collins' "racist comments" require an apology and resignation. Lam added maliciously "she was not inclined to advocate for Collins' resignation until after their phone conversation ended. Lam says Collins was unapologetic and that "voices were raised." Lam selectively omitted to state the truth which is that the voice raised was hers. DEFENDANT Lam deliberately mischaracterized the conversation with Ms. Collins to achieve the desired objective of hurting Ms. Collins based on the big lie DEFENDANT have generated and ignited like wildfire.

52.     On March 20, 2021 San Francisco Supervisors published a letter on the urging of DEFENDANT Commissioner Jenny Lam calling Commissioner Collins' tweets "racist" and calling for her resignation. This letter was signed by DEFENDANTS Commissioners Jenny Lam and Faauuga Moliga.

53.     On March 23, 2021 DEFENDANT JENNY LAM described the violence and erasure that Asian American Community is facing and characterized MS. COLLINS comments as "ignorant" and stated MS. COLLINS' words "undermine the labor of communities in our schools to dismantle" Anti-Asian bias. She sated MS. COLLINS lacked "care and compassion" and questioned MS. COLLINS' ability to "govern a school district that is almost half Asian American and Pacific Islander."

54.     DEFENDENT FAAUUGA MOLIGA stated MS. COLLINS' statements regarding the Asian American community were "dangerous, hurtful and unbecoming." He continued by stating, "With the current ethnic and racial climate in our country, and the heightened fear and violence impacting Asian Americans, these statements, no matter what context, are counter-productive and erosive to the trust and work we are called to

COMPLAINT FOR DAMAGES

do on behalf of the students, parents, teachers, staff, and the City and County of San Francisco." One commenter stated: "She took Lowell away from us and from many other people who sacrificed time other families chose not to sacrifice…Shame on you Ali Collins! Shame on you!" Despite the disparaging, shaming and often verbally abusive comments made by constituents, DEFENDANTS MOLIGA AND LAM criticized President Gabriela Lopez for not allowing more time for MS. COLLINS to be berated than the twenty minutes of time originally allotted for this purpose.

55.    On March 23, 2021, DEFENDANTS organized a plan to insert an emergency resolution into Thursday's "Special Meeting" to strip MS. COLLINS of her vice presidency title and to remove her from all committees.

56.    On March 24 Commissioner Moliga gave disparaging and slanderous comments at a SF Democratic Central Committee Meeting based on a false assertion that Ms. Collins is racist.

57.    On March 24, 2021, DEFENDANTS abandoned the Board's usual practice of consulting Board President Gabriela Lopez to change the agenda, opting to secretly conspire, agree and act with four (4) Board members, creating a "Quorum", to change the agenda for the Special Meeting, violating the Brown Act requiring transparency for all government actions by a quorum.

58.     On March 24, 2021, DEFENDANTS posted a 24-hour advance notice of the Special Meeting to remove MS. COLLINS from her position as vice president and strip her of her committee assignments.

59.    On March 25, 2021, DEFENDANT Board Commissioners voted 5-2 to suspend the rules, take up DEFENDANTS' resolution and strip MS. COLLINS of her VP title, and remove her from all committees.

60.    Each DEFENDANT Board Member voted as follows:

President Lopez – No

V.P. Collins – No

DEFENDANT Board Member JENNY LAM (Chinese American – Initiated the Motion to Media rather than through the President) – "Yes"

DEFENDANT Board Member FAAUUGA MOLIGA (Samoan/Pacific Islander – joined with Lam in bringing the Motion to the Media) – "Yes"

DEFENDANT Board Member MATT ALEXANDER (White) – "Yes"

DEFENDANT Board Member KEVIN BOGGESS (Black – just joined the BOE in January) – "Yes".

DEFENDANT Board Member Mark Sanchez (LatinX) – "Yes"

61.     In perpetuating DEFENDANTS big lie, they deliberately and intentionally failed to report to media MS. COLLINS' advocacy for students from all cultural backgrounds, including the Asian American and Pacific Islander communities. These include the following policies:

(1) Equity Studies to Implement Humanizing Learning Experiences for All Students Resolution which requires the district to "centralize decolonizing and anti-oppressive pedagogical scholarship" and support schools to "identify the most effective practices in developing educator leader capacity to address the issues of race/ethnicity, language, culture, gender identity, expression, and sexual orientation, ability and underserved populations as they impact instruction in the classroom."

(2) Resolution to Adopt the Declaration of the Rights of All Students to Equity and Access in Arts Learning which mandates quality arts instruction be provided PreK – twelfth grade, and that this art instruction be "culturally and linguistically responsive and relevant, with particular attention to those populations that have traditionally been excluded or precluded, such as English Learners, students of color, foster youth, homeless youth students in poverty, migrant students and students with disabilities" and that this instruction honor "all cultures, languages and abilities by

COMPLAINT FOR DAMAGES

23

recruiting, retaining and developing staff to deliver arts and music instruction which reflects our city's rich cultural heritage and diversity." This instruction may include "Chinese traditional instruments, Filipino dance, Japanese brush painting," among other arts.

## FEDERAL CLAIMS

### FIRST CAUSE OF ACTION
**Deprivation of First Amendment**
**Right of Free Public Concern Speech**
**In Violation Of 42 U.S.C. 1983**
**(Against All DEFENDANTS AND DEFENDANT BOARD COMMISSIONERS: Jenny Lam, In Her Individual Capacity; Faauuga Moliga In His Individual Capacity; Matt Alexander In His Individual Capacity; Kevin Boggess In His Individual Capacity; AND Mark Sanchez In His Individual Capacity)**

62.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

63.    Federal Civil Rights Law 42. U.S.C. §1983 provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".

64.    DEFENDANTS, at all relevant times, had read, understood, and pledged to defend and uphold the First Amendment of the United States constitution, providing, in pertinent part: "Congress shall make no law …. abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." DEFENDANTS, at all relevant times knew that the First Amendment is applicable to the States under the provisions of the Fourteenth Amendment.

COMPLAINT FOR DAMAGES

65.     DEFENDANTS, at all relevant times, "subjected" S. COLLINS, a "citizen of the United States… "to the deprivation of her First Amended Right of Free Speech. Therefore, beyond a pixel of a doubt, DEFENDANTS, and each of them, are liable under Federal Law, 42 U.S.C. Section 1983 to MS. COLLINS for all the harms, injuries, losses, and damages, including, but not limited to, all economic and non-economic damages, pain, misery, anxiety, loss of enjoyment of life, humiliation, fear, Spiritual deprivation, discomfort, damage to self-image and damage to career, inconvenience, and suffering.

66.     DEFENDANTS, and each of them, retaliated against PLAINTIFF because she exercised her First Amendment Right of Free Speech regarding public concerns. Specifically, MS. COLLINS complained publicly on Twitter, and to DEFENDANTS, SFUSD managers, agents and those in authority that the DEFENDANT SFUSD was engaging in conduct which threatened the mental health and self-esteem of Black and Brown Children by allowing Black and Brown Children to be called racist names. MS. COLLINS complained that her daughter had been called a "Bitch" and the school had not taken any remedial action to protect her child or other children of color from racial and gender abuse. MS. COLLINS always spoke as a private citizen and out of concern for the welfare of all school children, a matter of great public interest.

67.     As a direct result of MS. COLLINS' complaints of unsafe and hostile school environment for children of color, DEFENDANTS, and each of them, engaged in adverse employment actions, causing MS. COLLINS to suffer certain harms, injuries, and to be forced to endure unpleasant employment conditions and deprivation of employment benefits.

68.     DEFENDANTS retaliated against MS. COLLINS for engaging in speech protected by the First Amendment. MS. COLLINS' speech clearly consists of protesting DEFENDANT SFUSD's failure to protect Black and Brown and immigrant and economically deprived children from racism, sexism, classism, and harmful words such as "Bitch", a harmful word that is a silent form of violence, inflicting and exacting the same measure of lasting pain. DEFENDANTS' blanket policy of failing to take corrective

COMPLAINT FOR DAMAGES

action to protect vulnerable Black and Latino children is a failure to perform a mandatory duty, and their acts of "abridging the free speech" rights of MS. COLLINS prove that DEFENDANTS are more concerned with sucking the political sap generated by the displaced legitimate hurt feelings of only one of many victims of American racism than being also concerned with protecting Black and Latino children.

69.     "A public employer may not [take adverse action such as] discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *LeFande v. D.C.*, 613 F.3d 1155, 1158 (D.C. Cir. 2010) To determine whether such a violation has come to pass, the Ninth Circuit follows the D.C. Circuit's four-part inquiry: "First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that his speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." *Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting *Wilburn v Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two inquiries are questions of law, while the last two are questions of fact usually left to the jury." *Thompson*, 428 F.3d at 286. At the pleading stage, however, the Complaint must still "allege[] sufficient facts for a jury to conclude" that each factor has been satisfied, see id., giving plaintiffs the benefit of all reasonable inferences. See *Sparrow*, 216 F.3d at 1113.

70.     The first prong of the test "really imposes two requirements – that the employee speak 'as a citizen' and that the speech be 'on a matter of public concern.'" *Hawkins v. D.C.*, 923 F. Supp. 2d 128, 137 (D.D.C. 2013). The "matter of public concern" requirement should be addressed first because "[i]f the speech is not on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction.'" *LeFande*, 613 F.3d at 1159) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

71.     Clearly, MS. COLLINS' speech was a matter of public concern regarding racial and gender bullying and racial and gender harassment against Black and Latino school children in December 2016 as a private, non-government employee, and occurred two (2) years before she was democratically elected to the Board of Education; and (4) years before DEFENDANTS' illegal action of punishing her, by purging MS. COLLINS of the duties of her job, for the four-years prior speech as a private citizen. DEFENDANTS' illegal conduct of removing MS. COLLINS from the duties of her job was an adverse action.

72.     The Ninth Circuit has endorsed the D.C. Circuit position refuting "the proposition that a personnel matter per se cannot be a matter of public concern." *LeFande*, 613 F.3d at1161. Rather, speech "relates to a matter of public concern if it is 'of political, social, or other concern to the community.'" Id. at 1159 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). As an example, were the head of a city department "to assert the power to fire, without process, all [its subordinate] officers, paid and unpaid, that action would 'be fairly considered as relating to [a] matter of political, social, or other concern to the community' . . . although it relates to a 'personnel matter.'" Id. at 1161.

73.     The next question in the analysis is whether MS. COLLINS spoke "as a citizen" or, instead, "pursuant to [her] official duties." *Garcetti*, 547 U.S. at 421. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. (district attorney did not speak as private citizen when he wrote and filed memorandum that was "part of what he, as a calendar deputy, was employed to do").

74.     This element is inapplicable since MS. COLLINS' speech was during the time she was a private, non-government employee. Hence, she had no "official duties."

*75.*     Finally, DEFENDANTS will be unable to credibly argue that they would have reached the same decision of terminating MS. COLLINS's vice president position and membership on committees, since DEFENDANTS cited in the "Resolution" MS.

COMPLAINT FOR DAMAGES

COLLINS' 2016 Twitter speech: *"WHEREAS: The inflammatory statements made by Commissioner Collins towards the Asian American community in 2016 perpetuate gross and harmful stereotypes and leave no room for nuance or potential misunderstanding."*

76.    DEFENDANTS would not have reached the same decision of stripping MS. COLLINS of her position as vice president and of her committee assignments absent her protected speech in 2016, protesting the mistreatment of Black and Latino children and advocating for unity of all victims of American Racism, including the Asian community.

77.    In *Bond v. Floyd*, 385 U.S. 116 (1966), reversing the district court, the U.S. Supreme Court addressed a similar attempt by the Georgia legislature to deny rights of an elected official to his elected duties based on his prior speech. Co-Counsel in this action, Mr. Howard Moore Jr, appeared for Plaintiff Bond:

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented in this case is whether the Georgia House of Representatives may constitutionally exclude appellant Bond, a duly elected Representative, from membership because of his statements, and statements to which he subscribed, criticizing the policy of the Federal Government in Vietnam and the operation of the Selective Service laws. An understanding of the circumstances of the litigation requires a complete presentation of the events and statements which led to this appeal.

Bond, a Negro, was elected on June 15, 1965, as the Representative to the Georgia House of Representatives from the 136th House District. Of the District's 6,500 voters, approximately 6,000 are Negroes. Bond defeated his opponent, Malcolm Dean, Dean of Men at Atlanta University, also a Negro, by a vote of 2,320 to 487.

On January 6, 1966, the Student Nonviolent Coordinating Committee, a civil rights organization of which Bond was then the Communications Director, issued the following statement on American

policy in Vietnam and its relation to the work of civil rights organizations in this country:

"The Student Nonviolent Coordinating Committee has a right and a responsibility to dissent with United States foreign policy on an issue when it sees fit. The Student Nonviolent Coordinating Committee now states its opposition to United States' involvement in Viet Nam on these grounds:

119*119 "We believe the United States government has been deceptive in its claims of concern for freedom of the Vietnamese people, just as the government has been deceptive in claiming concern for the freedom of colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia and in the United States itself.

"We, the Student Nonviolent Coordinating Committee, have been involved in the black people's struggle for liberation and self-determination in this country for the past five years. Our work, particularly in the South, has taught us that the United States government has never guaranteed the freedom of oppressed citizens, and is not yet truly determined to end the rule of terror and oppression within its own borders.

"We ourselves have often been victims of violence and confinement executed by United States government officials. We recall the numerous persons who have been murdered in the South because of their efforts to secure their civil and human rights, and whose murderers have been allowed to escape penalty for their crimes.

"The murder of Samuel Young in Tuskegee, Ala., is no different than the murder of peasants in Viet Nam, for both Young and the Vietnamese sought, and are seeking, to secure the rights guaranteed them by law. In each case the United States government bears a great part of the responsibility for these deaths.

"Samuel Young was murdered because United States law is not being enforced. Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law. The United States is no respecter of persons or law 120*120 when such persons or laws run counter to its needs and desires.

"We recall the indifference, suspicion and outright hostility with which our reports of violence have been met in the past by government officials.

"We know that for the most part, elections in this country, in the North as well as the South, are not free. We have seen that the 1965 Voting Rights Act and the 1964 Civil Rights Act have not yet been implemented with full federal power and sincerity.

"We question, then, the ability and even the desire of the United States government to guarantee free elections abroad. We maintain that our country's cry of `preserve freedom in the world' is a hypocritical mask behind which it squashes liberation movements which are not bound, and refuse to be bound, by the expediencies of United States cold war policies.

"We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft which would compel them to contribute their lives to United States aggression in Viet Nam in the name of the `freedom' we find so false in this country.

"We recoil with horror at the inconsistency of a supposedly `free' society where responsibility to freedom is equated with the responsibility to lend oneself to military aggression. We take note of the fact that 16 per cent of the draftees from this country are Negroes called on to stifle the liberation of Viet Nam, to preserve a `democracy' which does not exist for them at home.

"We ask, where is the draft for the freedom fight in the United States?

"We therefore encourage those Americans who prefer to use their energy in building democratic forms within this country. We believe that work in the civil rights movement and with other human relations organizations is a valid alternative to the draft. We urge all Americans to seek this alternative, knowing full well that it may cost their lives— as painfully as in Viet Nam."

On the same day that this statement was issued, Bond was interviewed by telephone by a reporter from a local radio station, and, although Bond had not participated in drafting the statement, he endorsed the statement in these words:

"Why, I endorse it, first, because I like to think of myself as a pacifist and one who opposes that war and any other war and eager and anxious to encourage people not to participate in it for any reason that they choose; and secondly, I agree with this statement because of the reason set forth in it— because I think it is sorta hypocritical for us to maintain that we are fighting for liberty in other places and we are not guaranteeing liberty to citizens inside the continental United States.

"Well, I think that the fact that the United States Government fights a war in Viet Nam, I don't think that I as a second class citizen of the United States have a requirement to support that war. I think my responsibility is to oppose things that I think are wrong if they are in Viet Nam or New York, or Chicago, or Atlanta, or wherever."

Before January 10, 1966, when the Georgia House of Representatives was scheduled to convene, petitions challenging Bond's right to be seated were filed by 75 House members. These petitions charged that Bond's statements gave aid and comfort to the enemies of the United States and Georgia, violated the Selective Service laws, and tended to bring discredit and disrespect on the House. The petitions further contended that Bond's

COMPLAINT FOR DAMAGES

endorsement of the SNCC statement "is totally and completely repugnant to and inconsistent with the mandatory oath prescribed by the Constitution of Georgia for a Member of the House of Representatives to take before taking his seat."

We conclude as did the entire court below that this Court has jurisdiction to review the question of whether the action of the Georgia House of Representatives deprived Bond of federal constitutional rights, and we now move to the central question posed in the case—whether Bond's disqualification because of his statements violated 132*132 the free speech provisions of the First Amendment as applied to the States through the Fourteenth Amendment.

We do not quarrel with the State's contention that the oath provisions of the United States and Georgia Constitutions do not violate the First Amendment. But this requirement does not authorize a majority of state legislators to test the sincerity with which another duly elected legislator can swear to uphold the Constitution. Such a power could be utilized to restrict the right of legislators to dissent from national or state policy or that of a majority of their colleagues under the guise of judging their loyalty to the Constitution. Certainly there can be no question but that the First Amendment protects expressions in opposition to national foreign policy in Vietnam and to the Selective Service system.

Nor does the fact that the District Court found the SNCC statement to have racial overtones constitute a reason for holding it outside *135 the protection of the First Amendment.

**We therefore hold that the disqualification of Bond from membership in the Georgia House because of his statements violated Bond's right of free expression under the First Amendment. [Emphasis added]**

COMPLAINT FOR DAMAGES

78.     As in *Bond*, supra, DEFENDANTS' **admission** of removing MS. COLLINS' from her position of vice-president and stripping her of all committee assignments **because of her speech in December 2016 is an admission that DEFENDANTS, and each of them, violated MS. COLLINS' First Amendment Right of Free Speech.** DEFENDANTS' retaliated against MS. COLLINS for speaking up, protesting the DEFENDANTS' failure to protect Black and Latino children from racist and gender harassment, and racist and gender bullying, and her speech advocating unity of all oppressed people, including Asians. A state official may be sued under section 1983 in his or her individual capacity for damages. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *but see Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010) (holding that in order to be individually liable under ' 1983, individual must personally participate in alleged rights deprivation). DEFENDANT Board Members sued herein participated in the deprivation of MS. COLLINS' First Amendment Right of Free Speech. Hence, DEFENDANT Board Members, and each of them, are liable.

79.     DEFENDANTS at all times knew that MS. COLLINS' speech regarding encouraging participation in the movement of *Asian Lives Matters* was spoken in good faith, encouraging unity. All great leaders have inspired, cajoled, and employed anecdotes to motivate civil protest against injustice. Dr. Martin Luther King: "There comes a time when silence is betrayal." "In the end, we will remember not the words of our enemies, but the silence of our friends." "A man who won't die for something is not fit to live." "We must live together as brothers or perish together as fools."

80.     Malcolm X: There was two kinds of slaves. There was the house Negro and the field Negro. "Uncle Toms", to keep us from resisting, are like Novocain, making us suffer quietly." Everyone understood these words of these great leaders were aimed to encourage resistance to oppression. And so were the words of MS. COLLINS' tweets.

81.     DEFENDANTS, and each of them, violated MS. COLLINS' First Amendment Right of Free Speech, creating in each of them liability for all her damages, harms, injuries, and losses.

COMPLAINT FOR DAMAGES

82.     DEFENDANTS' illegal conduct entitles MS. COLLINS to all damages incurred as herein alleged. DEFENDANTS, and each of them, are liable to MS. COLLINS for compensatory damages in an amount of money equal and to balance, on one side of the scale, all the harms, losses, damages and injuries caused, with an amount of money on the other side of the scale. DEFENDANTS, and each of them, caused MS. COLLINS to suffer, in perpetuity, for the rest of her life the following harms, injuries loses and damages: Pain, inconvenience, severe mental distress, severe emotional distress, loss of enjoyment of life, humiliation, harm to self-image, injury to career, spiritual injury to her soul, fear, discomfort, misery, anxiety, and suffering.

83.     The amount of money to balance these logarithmically increasing permanent harms, $12,000,000.00, will only tip the scale in the direction of injustice. In the spirit of compromise, this amount is the demand that any reasonable jury will award as the price for violating MS. COLLINS' historic, paradigm shifting, First Amendment Rights of the United States Constitution by DEFENDANT oath takers.

84.     DEFENDANTS' illegal intentional conduct was calculating, oppressive, malicious, designed to extract maximum anguish, pain, severe mental and severe emotional distress, and was done with ill will, intended to vex, hurt with a conspiratorial disregard for the constitutional rights, health and safety of MS. COLLINS and her family. Further, DEFENDANTS, and each of them, acted with malice, oppression and fraud against MS. COLLINS, entitling her to Punitive Damages, to protect the public from the gross misuse of governmental power, in the amount of $3,000,000 from each DEFENDANT BOARD MEMBER, sued in his/her individual capacity.

85.     MS. COLLINS hereby Request this Court to issues an Order to Show Cause why DEFENDANTS, and each of them, should not be ordered to reinstate MS. COLLINS to her position as vice president and to each of the committees DEFENDANTS illegally stripped away from her.

        Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

## SECOND CAUSE OF ACTION
**Deprivation of Liberty Without Due Process Under
The Fourteenth Amendment
In Violation Of Civil Rights
(42 U.S.C. § 1983)
(Against All DEFENDANTS AND DEFENDANT BOARD COMMISSIONERS:
Jenny Lam, *In Her Individual Capacity*; Faauuga Moliga *In His Individual Capacity*;
Matt Alexander *In His Individual Capacity*; Kevin Boggess *In His Individual
Capacity*; AND Mark Sanchez *In His Individual Capacity*)**

86.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

87.    The Fourteenth Amendment of the United States Constitution states, in relevant sections: "… No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, *liberty*, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." [Emphasis added]

88.    Federal Civil Rights Law 42. U.S.C. §1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".

89.    DEFENDANTS, at all relevant times, "subjected" MS. COLLINS, a "citizen of the United States… "to the deprivation of her Fourteenth Amended Right of **"liberty, without due process"**. DEFENDANTS, and each of them, are liable under Federal Law, 42 U.S.C. Section 1983 to MS. COLLINS for all the harms, injuries, losses, and damages, including, but not limited to, all economic and non-economic damages, pain, misery, anxiety, loss of enjoyment of life, humiliation, fear, spiritual deprivation, discomfort, damage to self-image and damage to career, inconvenience, and suffering.

90.     The Fourteenth Amendment protects against deprivation of liberty and property interests without due process of law. *See K.W. ex rel. D.W v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015). "A person's liberty interest is implicated if the government levels a charge against him that impairs his reputation for honesty or morality. . ." *Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009), as amended (citation and internal quotation marks omitted). If the government, in the course of terminating a person's employment, publicly discloses stigmatizing information, the employee is entitled to a "name-clearing hearing." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004)." *Kramer v. Cullinan*, No. 14-36103 (9th Cir. 2018)

91.     "To establish that she "has a protected liberty interest at stake," a plaintiff must demonstrate that: "(1) the accuracy of the charge is contested, (2) there [was]some public disclosure of the charge, and (3) the charge [was] made in connection with the termination of employment . . ." See *Guzman*, 552 F.3d at 955 (citation and internal quotation marks omitted). Whether a defendant's statements rise to the level of stigmatizing a plaintiff is a question of fact. See *Campanelli v. Bockrath*, 100 F.3d 1476, 1480 (9th Cir. 1996). We have previously held that charges made by an employer may be sufficiently stigmatizing to implicate an employee's liberty interest. See, e.g., Guzman, 552 F.3d at 946 (accusing employee of fraudulently avowing that medical devices were FDA-approved); Campanelli, 100 F.3d at 1480 (charging coach with "immoral conduct"); Vanelli v. Reynolds Sch. Dist., 667 F.2d 773, 776–78 (9th Cir. 1982) (dismissing teacher for "offensive conduct")" *Kramer v. Cullinan,* supra.

92.     DEFENDANTS, and each of them, the government, leveled "…a charge against [MS. COLLINS] that impairs [her] reputation for honesty or morality." DEFENDANTS published in their illegal "Resolution":

WHEREAS: The inflammatory statements made by Commissioner Collins towards the Asian American community in 2016 perpetuate gross and harmful stereotypes and leave no room for nuance or potential misunderstanding; and,

COMPLAINT FOR DAMAGES

WHEREAS: Our relationship with elected officials must be predicated on mutual respect, and when our elected officials falter, we are faced with the difficult decision of how to hold them accountable; and

WHEREAS: When the social media comments resurfaced, what mattered most was that **she, as a leader and elected official, accept responsibility and atone for the trauma inflicted on the community by her words;** and

WHEREAS: Although Commissioner Collins has acknowledged that her words may have caused pain, **her public statements to-date have fallen short of sincere recognition of the harm** she has caused and Vice President Collins **does not seem to take meaningful responsibility for her actions.**

93.    DEFENDANTS failed to provide MS. COLLINS with a "name-clearing hearing"…in the course of terminating [her vice-presidency and committee membership] after "publicly discloses stigmatizing information". Fourteenth Amendment Due Process requires "a hearing "the employee is entitled to." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004)." DEFENDANTS, in their "Resolution" accuse MS. COLLINS of dishonest and immorality, stating: "…**her public statements to-date have fallen short of *sincere recognition of the harm.*" And that she has not "*atoned*" and "…does not seem to take *meaningful responsibility* for her actions.**"  DEFENDANTS' "Resolution" is based on arbitrary and capricious grounds. What Sincereometer, or Atonement-barometer or meaningful responsibility yardstick did DEFENDANTS employ to compel these baseless conclusions? An arbitrary and capricious law is a violation of due process. DEFENDANTS' 24-hour notice for the "Special Meeting" hardly satisfies either procedural or substantive due process.

94.    The Supreme Court in *Bond v Floyd*, supra, made clear the subjective view of an elected official's "loyalty" or "sincerity" cannot be used to abridge the official's First Amendment Right of Freedom of Speech:

"[W]e do not quarrel with the State's contention that the oath provisions of the United States and Georgia Constitutions do not violate the First Amendment. **But this requirement does not authorize a majority of state**

**legislators to test the *sincerity* with which another duly elected legislator can swear to uphold the Constitution.** Such a power could be utilized to restrict the right of legislators to dissent from national or state policy or that of a majority of their colleagues under the guise of judging their loyalty to the Constitution. *Bond v. Floyd*, supra.

95.   DEFENDANTS, and each of them, are liable for an amount of money to balance these logarithmically increasing permanent harms. $12,000,000.00 will only tip the scale in the direction of injustice. In the spirit of compromise, this amount is the demand that any reasonable jury will award as the price for violating MS. COLLINS' historic, paradigm shifting, Fourteenth Amendment Rights of the United States Constitution by DEFENDANT oath takers.

96.   DEFENDANTS violated MS. COLLINS' protected liberty interest. MS. COLLINS "has a protected liberty interest at stake," because: "(1) the accuracy of the charge is contested, (2) there [was]some public disclosure of the charge, and (3) the charge [was] made in connection with the termination of employment position as vice-president and committee assignments.

97.   DEFENDANTS' illegal intentional conduct was calculating, oppressive, malicious, designed to extract maximum anguish, pain, severe mental and severe emotional distress, and was done with ill will, intended to vex, hurt with a conspiratorial disregard for the constitutional rights, health and safety of MS. COLLINS and her family. Further, DEFENDANTS, and each of them, acted with malice, oppression and fraud towards MS. COLLINS, entitling her to Punitive Damages, to protect the public from the gross misuse of governmental power, in the amount of $3,000,000 from each DEFENDANT BOARD MEMBER, sued in his/her individual capacity.

98.   MS. COLLINS hereby requests this Court to issue an Order to Show Cause why DEFENDANTS, and each of them, should not be ordered to reinstate MS. COLLINS to her position as vice president and to each of the committees DEFENDANTS illegally stripped away from her.

COMPLAINT FOR DAMAGES

Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

### THIRD CAUSE OF ACTION
**Deprivation of Property Without Due Process**
**In Violation of Fourteenth Amendment 42 U.S.C. 1983**
**(Against All DEFENDANTS AND DEFENDANT BOARD COMMISSIONERS:**
**Jenny Lam,** *In Her Individual Capacity***; Faauuga Moliga** *In His Individual Capacity***;**
**Matt Alexander** *In His Individual Capacity***; Kevin Boggess** *In His Individual*
***Capacity***; AND Mark Sanchez** *In His Individual Capacity***)**

99.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

100.   The Fourteenth Amendment of the United States Constitution states, in relevant sections: "… No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or *property,* without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." [Emphasis added]

101.   Federal Civil Rights Law 42. U.S.C. §1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".

102.   DEFENDANTS, at all relevant times, "subjected" MS. COLLINS, a "citizen of the United States… "to the deprivation of her Fourteenth Amended Right of *"property without due process"*. DEFENDANTS, and each of them, are liable under Federal Law, 42 U.S.C. Section 1983 to MS. COLLINS for all the harms, injuries, losses, and damages, including, but not limited to, all economic and non-economic damages, pain, misery, anxiety, loss of enjoyment of life, humiliation, fear, spiritual deprivation, discomfort, damage to self-image and damage to career, inconvenience, and suffering.

103.    DEFENDANTS violated MS. COLLINS' "Skelly Rights". The California Supreme in *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194. held that a civil service or public sector employee has a property right to his job and could not be deprived of it without due process. MS. COLLINS' job as a commissioner included her positions as vice-president and her duties on various committees. The minimum due process required under *Skelly* are the following:

(1)    The employee must receive notice of the proposed discipline (a/k/a Notice of Adverse Action, or "Notice");

(2)    The Notice must identify the specific rule/policy that has allegedly been violated by the employee;

(3)    The Notice must allege a factual basis for violation (i.e., "cause for discipline");

(4)    The Notice must be served with all documents that were relied upon by the official proposing the discipline;

(5)    The Notice must provide a deadline for any response;

(6)    The Notice must include an effective date of discipline; and

(7)    Legal representation

104.    DEFENDANTS failed to provide MS. COLLINS with any due process, failed to hold a "name clearing hearing", and arbitrarily and capriciously terminated MS. COLLINS' employment duties, a property interest.

105.    DEFENDANTS, and each of them, are liable for an amount of money to balance these logarithmically increasing permanent harms. $12,000,000.00, will only tip the scale in the direction of injustice. In the spirit of compromise, this amount is the demand that any reasonable jury will award as the price for violating MS. COLLINS' historic, paradigm shifting, Fourteenth Amendment Rights of the United States Constitution by DEFENDANT oath takers.

106.    DEFENDANTS' illegal intentional conduct was calculating, oppressive, malicious, designed to extract maximum anguish, pain, severe mental and severe

COMPLAINT FOR DAMAGES

emotional distress, and was done with ill will, intended to vex, hurt with a conspiratorial disregard for the constitutional rights, health and safety of MS. COLLINS and her family. Further, DEFENDANTS, and each of them, acted with malice, oppression and fraud towards MS. COLLINS, entitling her to Punitive Damages, to protect the public from the gross misuse of governmental power, in the amount of $3,000,000 from each DEFENDANT BOARD MEMBER, sued in his/her individual capacity.

Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

## QUALIFIED IMMUNITY NO DEFENSE

107.   DEFENDANTS are not entitled to the Qualified Immunity Defense. "To determine whether a public official is entitled to qualified immunity, we consider 1) whether the official violated a constitutional right, and 2) whether the "right was clearly established at the time of the official's alleged misconduct." *Kramer v. Cullinan*, supra. DEFENDANTS violated MS. COLLINS' First and Fourteenth Amendments Constitutional Rights clearly established long before DEFENDANTS' illegal "Resolution". Indeed, *Bond*, supra, established in 1966 the law that the First Amendment protected an elected official's speech made in the public interest on matter of public policy, both as a private person as well in his official capacity.  Hence, the Qualified Immunity Defense is unavailing to DEFENDANTS.

Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

## STATE CLAIMS

### FOURTH CAUSE OF ACTION
### Intentional Infliction Of Emotional Distress
### (Against All DEFENDANTS AND DEFENDANT BOARD COMMISSIONERS: Jenny Lam, *In Her Individual Capacity*; Faauuga Moliga *In His Individual Capacity*; Matt Alexander *In His Individual Capacity*; Kevin Boggess *In His Individual Capacity*; AND Mark Sanchez *In His Individual Capacity*)

108.   PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

COMPLAINT FOR DAMAGES

109.    DEFENDANTS' intentional, conspiratorial, and deliberate indifference to MS. COLLINS' health, safety, reputation in the community, and by slandering her as a "Racist", dishonest, immoral person while depriving her of her constitutional rights   is extreme and outrageous conduct. DEFENDANTS' illegal retaliation and violations infringed on MS. COLLINS' exercise of her United States Constitution First and Fourteenth Amendments rights of Free Speech and Liberty.  DEFENDANTS' conduct violates federal and state laws and public policy and as such should not be tolerated in a civilized society.

110.    DEFENDANTS' conduct was intentional and caused MS. COLLINS to suffer severe emotional distress. As to DEFENDANT BOARD MEMBERS only, the acts of these DEFENDANTS, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure MS. COLLINS and to cause her mental anguish, anxiety, and distress.  DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to MS. COLLINS and were a substantial factor in causing harm, damage, and injuries and committed with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFF to punitive damages against these DEFENDANTS only.

Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

**FIFTH CAUSE OF ACTION**
**Negligence Government Code Section 815.2**
**(Against DEFENDANT Employer SFUSD)**
**PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.**

111.    California Government Code Section 815.2.  (a) provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

112.    DEFENDANT BOARD MEMBERS owed a duty of care to MS. COLLINS to conduct themselves so as to avoid risk of injury to her. DEFENDANT BOARD MEMBERS

breached their duty to MS. COLLINS by terminating her employment position as vice president and her committee duties. DEFENDANT BOARD MEMBERS breached this duty and were negligent.

113.    As a direct and legal result of DEFENDANTS ' negligence as set forth herein, MS. COLLINS has suffered and continues to suffer substantial economic and non-economic damage in an amount according to proof.

Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

## SIXTH CAUSE OF ACTION
### Violation of Property Interest Under Skelly
### (Against DEFENDANT Employer SFUSD)
**PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.**

114.    DEFENDANTS violated MS. COLLINS' "Skelly Rights". The California Supreme in *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.  held that a civil service or public sector employee has a property right to his job and could not be deprived of it without due process. MS. COLLINS' job as a commissioner included her positions as vice-president and her duties on various committees. DEFENDANTS intentionally and willfully failed to provide even the minimum due process required under *Skelly*.

115.    As a direct and legal result of DEFENDANTS ' due process violations required by *Skelly*, as set forth herein, MS. COLLINS has suffered and continues to suffer substantial economic and non-economic damage in an amount according to proof.

116.            Wherefore, PLAINTIFF prays for judgment as more fully set forth below.

## SEVENTH CAUSE OF ACTION
### Retaliation
### In Violation of California Labor Code § 1102.5
### (Against Defendant Employer)

117.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

118.    California Labor Code § 1101.5 states:

(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised their rights under subdivision (a), (b), or (c) in any former employment.

(e) A report made by an employee of a government agency to their employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

119.    DEFENDANTS, and each of them, in violation of Labor Code, Section 1102.5 retaliated against MS. COLLINS for disclosing the following information showing DEFENDANTS that proposed "Resolution" to strip her of her employment duties based on her words tweeted four years prion was a violation of federal and state law, violation of the First Amendment of Free Speech and Fourteenth Amendment Due Process. MS. COLLINS report to DEFENDANTS BOARD:

120.    The intent and purpose of this resolution and the urgent and irregular manner in which it has been conceived and presented raise several questions and concerns. I am

compelled to provide the following comments for the record, while also noting there will likely be more to follow:

1.    *As a matter of process* and to ensure proper discharge of this Board's duties, it is the Board President who sets the agenda and runs the meeting of the whole. ***Despite a unanimous vote by this body to nominate President Lopez to perform these roles (and others), it appears the proper process and the role of the Board president are now being disregarded.***

2.    This Board has agreed and stated publicly the NUMBER ONE priority is the reopening of SFUSD schools as quickly and as safely as possible. The public has made it abundantly clear they want to see more evidence of that commitment in terms of time spent in these meetings, and tangible results. This resolution distracts from priority matters and at the same time could have potential negative impacts on the proper functioning of this board at a critical moment for the District and the City.

3.    Recently the Board has undertaken the critically important task of finding a new Superintendent, which this body had agreed would be the focus of todays meeting. The resolution put forth at this time and in this manner detracts from this purpose and causes additional risk of delaying this process and destabilizing the District.

4.    Now more than ever we need to work together and effectively as a Board and with other stakeholders to address the critical challenges of this moment. This resolution does nothing to enhance our team, nor our chances for success and I worry harm has already been done regardless of the outcome of this discussion.

5.    Lastly, I reject the attempts to mischaracterize me as a person, and as a member of this board. [Emphasis added]

121.   DEFENDANTS, and each of them, responded that MS. COLLINS words **"have fallen short of sincere"** and she had refused to **"accept responsibility and atone"**.

COMPLAINT FOR DAMAGES

DEFENDANTS ignored MS. COLLINS statement "Despite a unanimous vote by this body to nominate President Lopez to perform these roles (and others), it appears the proper process and the role of the Board president are now being disregarded." MS. COLLINS raised concerns and expressed her belief that DEFENDANTS were violating the *Brown Act* by failing to follow legal procedures.

122.    DEFENDANTS then proceed, with a mere 24 hours' notice to the public, retaliating against MS. COLLINS by stripping her of her employment duties, causing irreparable harm and injury to MS. COLLINS reputation for which money damages are inadequate to remedy.

<u>**REQUEST OF ORDER TO SHOW CAUSE**</u>

<u>**WHY AN INJUNCTION SHOULD NOT ISSUE**</u>

123.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

124.    Federal Rule 65, Injunctions and Restraining Orders, provides:

*(a)* **Preliminary Injunction.**

(1) Notice. The court may issue a preliminary injunction only on notice to the adverse party.

(2) *Consolidating the Hearing with the Trial on the Merits.* Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

(b) **Temporary Restraining Order.**

(1) *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

125.    As proven hereinabove, DEFENDANTS passed an illegal Resolution, removing MS. COLLINS from her elected, by unanimous vote of the Board of Education, position as vice-president and stripped her of all committee assignments.

126.    DEFENDANTS violated MS. COLLINS' United States Constitutional Rights under the First and Fourteenth Amendments by publicly issuing their Resolution, causing irreparable harm to MS. COLLINS.

127.    DEFENDANTS' illegal conduct has caused, and is causing irreparable injury, loss and damage to MS. COLLINS, including damage to her reputation and standing in the community. Money damages are insufficient to cure the harms, damages and injuries MS. COLLINS has suffered and continues to suffer. Injunctive relief is required to restore MS. COLLINS to her positions on the Board of Education, pending the trial on the merits in this matter. MS. COLLINS will suffer irreparable injury or injuries for which there are no adequate remedies at law for loss of her position as Vice President and removable from committees.

128.    Request is hereby made of an Order to Show Cause issued to DEFENDANTS to show cause why a permanent injunction should not be issued, restoring MRS, COLLINS to her elected employment position.

## PUNITIVE DAMAGES

129.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

130.    DEFENDANTS' acts, as alleged herein, as to all causes of action, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure MS. COLLINS and to cause her mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to MS. COLLINS and with the intent to injure, constituting oppression, fraud, and malice under

COMPLAINT FOR DAMAGES

California Civil Code §3294, entitling MS. COLLINS to punitive damages against individual DEFENDANTS only.

## PRAYER FOR RELIEF

131.      Wherefore, PLAINTIFF prays for judgment against DEFENDANTS, and each of them as follows:

1.      For general damages as to each DEFENDANT in an amount $12,000,000 or according to proof;

2.      For special damages in an amount according to proof;

3.      For prejudgment interest in an amount according to proof;

4.      For reasonable attorney's fees and cost of suit therein required by statute;

5.      For punitive damages as to each DEFENDANT BOARD MEMBER in the amount of $3,000,000.00

6.      For statutory penalties and any other statutory relief;

7.      For such other and further relief as the court may deem proper;
9.      PLAINTIFF hereby demands a trial by jury.

**JURY TRIAL DEMANDED**


DATED: March 31, 2021              RESPECTFULLY SUBMITTED,
                                   LAW OFFICES OF BONNER & BONNER


                                   _/s/ Charles A. Bonner_
                                   CHARLES A. BONNER
                                   ATTORNEY FOR PLAINTIFF

COMPLAINT FOR DAMAGES