CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER &**
**BONNER**
475 GATE FIVE ROAD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

David C. Anderson
LAW OFFICES OF DAVID C. ANDERSON
591 Redwood Hwy., Bldg. 4000
Mill Valley, CA 94941-3039
Phone: (415) 395-9898
Facsimile: (415) 395-9839
Email: cynthia@dcandersonlaw.com

Howard Moore, Jr., Esq. (SBN 55228)
**MOORE & MOORE**
1569 Solano Avenue, #204
Berkeley, CA 94707
Tel: (510) 542-7172 / Fax: (510) 528-3024
Email: moorlaw@aol.com

ATTORNEYS FOR PLAINTIFF

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALISON COLLINS<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al.<br><br>Defendants. | **Case No.:  3:21-cv-02272-HSG**<br><br>**APPLICATION AND MOTION FOR ORDER DIRECTING DEFENDANTS TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE RESTORING PLAINTIFF TO HER POSITION AS VICE PRESIDENT OF THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT BOARD AND TO HER COMMITTEE APPOINTMENTS**<br><br>Date:  Thursday, August 19, 2021<br>Time:  2:00 PM<br>Courtroom:  Courtroom 2 – 4th Floor<br>Judge:  Honorable Haywood S. Gilliam, Jr. |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 30, 2021 at 1:30 pm in Department 6, or as soon thereafter as the matter may be heard in Courtroom 6 of the above-entitled Court, located at 1301 Clay Street, Oakland, CA 94612, Allison Collins will and hereby does move this Court for an order directing Defendants to show cause why a preliminary injunction should not issue restoring Plaintiff to her position as vice president of the San Francisco Unified School District Board and to her committee appointments

This motion is based on this Notice of Motion and **MOTION FOR ORDER DIRECTING DEFENDANTS TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE RESTORING PLAINTIFF TO HER POSITION AS VICE PRESIDENT OF THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT BOARD AND TO HER COMMITTEE APPOINTMENTS** and Memorandum of Points and Authorities in Support Thereof, the Declarations of Allison Collins; the papers and pleadings on file in this action; other oral and/or documentary evidence as my be presented at the hearing on this motion.

**Dated: May 26, 2021**                          **RESPECTFULLY SUBMITTED,**
                                                  **LAW OFFICES OF BONNER & BONNER**

                                                  /s/*Charles A. Bonner*
                                                  Charles A. Bonner

                                                  **Attorney for Plaintiff**

MOTION FOR PRELIMINARY INJUCTION                                    3:21-cv-02272-CRB

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................................... ii

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.   INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................ 3

III.   ARGUMENT ............................................................................................................. 18

  A.   Legal Standard ......................................................................................................... 19

  B.   Application of the Preliminary Injunction Standard ......................................... 19

    1.   COMMISSIONER COLLINS Can Demonstrate That She Will Likely Succeed On The Merits Of Her First Amendment Claims .......................................................................... 21

    2.   COMMISSIONER COLLINS Can Demonstrate That Significant Irreparable Harm Will Flow From Defendants' Conduct ................................................................................... 25

    3.   The Balance of Hardships Tips In Favor of COMMISSIONER COLLINS ................ 29

IV.   CONCLUSION ........................................................................................................ 31

1
2

## TABLE OF AUTHORITIES

3  **Cases**

4  *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 314-15

5     (9th Cir. 1978) ................................................................................................................ 19

6  *Blair v. Bethel School Dist.*, 608 F.3d 540 (9th Cir. 2010) ............................................ 31

7  *Chalk v. United States Dist. Court Cent. Dist.* 840 F.2d 701(9th Cir. 1988) ........................ 28, 29

8  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct.

9     814 (1971) ................................................................................................................ 19

10  *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)............ 20

11  *Elrod v. Burns*, 427 U.S. 347, 373(1976) ......................................................................... 25

12  *Eng v. Cooley* (9th Cir. 2009) 552 F.3d 1062, 1070. ........................................................ 22, 23

13  *Finot v. Pasadena City Bd. of Educ.*, 250 Cal. App. 2d 189, 202-03, 58 Cal. Rptr. 520, 529

14     (1967) ................................................................................................................ 28

15  *Frisby v. Schultz* 487 U.S. 474, 479(1988) ...................................................................... 24

16  *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir. 1992) ........................................ 20

17  *Garcetti v. Ceballos, 547 U.S. 410 (2006)* .................................................................... 23

18  *Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991) ........................................ 20

19  *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1210 (9th Cir. 2000) ............................ 20

20  *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760, 766 (9th Cir. 2004) ........................................ 20

21  *Iconix, Inc. v. Tokuda* (N.D.Cal. 2006) 457 F.Supp.2d 969, 974.) .............................................. 19

22  *L.A. Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.

23     1980) ................................................................................................................ passim

24  *Perry Ed. Assn. v. Perry Local Educators' Assn.* 460 U.S. 37 .................................................. 24

25  *Pickering v. Board of Education* 391 *U.S. 563 (1968)* .................................................... 21, 22, 24

26  *Rankin v. McPherson*, 483 U.S. 378, 383(1987) ......................................................... 21

27  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ............................ 20

28  *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002) ........................ 25

1

*Senate of State of Cal. v. Mosbacher*, 968 F. 2d 974, 977-78 (9th Cir. 1992).............................. 20

2

*Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982) ........................ 19

3

*Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993) ...................... 20

4

*Weinberger v. Romero-Barcelo* 456 U.S. 305, 312(1982) ......................................................... 25

5

**Statutes**

6

42. U.S.C. §1983........................................................................................................................ 23

7

Federal Rule of Civil Procedure 65 .......................................................................................... 21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PRELIMINARY INJUNCTION

3:21-cv-02272-CRB

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

COMMISSIONER COLLINS requests this Court to restore her position as Vice President of the S. F. Unified School District Board ("Board"), as well as her memberships on the Board's committees upon which she served prior to her unlawful removal in violation of her First Amendment right of free speech. The only means by which to remedy COMMISSIONER COLLINS' immediate and continuing irreparable harm and injuries is for this Court to issue a temporary restraining order and injunction against Defendant San Francisco Unified School District ("SFUSD") and its Board by ordering them to restore the status quo by returning COMMISSIONER COLLINS to the Board positions she held prior to DEFENDANTS engaging in their categorically unlawful conduct.

As there is a strong likelihood that COMMISSIONER COLLINS will prevail on the merits of her underlying First Amendment rights claim founded on DEFENDANTS' unlawful actions that were expressly based upon speech that was exercised well before COMMISSIONER COLLINS was an elected member of the School District Board, this Court is well justified in issuing a TRO as money damages can in no way remedy the irreparable damages, harms and injuries that COMMISSIONER COLLINS is suffering and will continue to suffer were a TRO not issued.

On March 24, 2021, COMMISSIONER COLLINS was summarily and without adequate prior legal notice, removed from her position as Board Vice President, as well as the entirety of her Board committee assignments **solely** because of the lawful exercise of her First Amendment rights as a private citizen some two (2) years before she was elected to the Board and four (4) years before the date of DEFENDANTS' illegal actions. DEFENDANTS removed COMMISSIONER COLLINS from her positions knowing that there was absolutely no evidence that she had repeated the constitutionally protected remarks she made as a private citizen after she was elected to the Board.

DEFENDANTS removed COMMISSIONER COLLINS despite the fact that there was no evidence that she had ever publicly discriminated against any racial or ethnic group or had

advocated for such discrimination, both as a private citizen and while sitting as a Board member, either in her role as Board Vice President and/or as a Board committee representative. At all relevant times, DEFENDANTS knew that COMMISSIONER COLLINS would prevail on the merits of her First Amendment claim because not only had DEFENDANTS taken an oath to uphold the Constitution, but also because DEFENDANTS' Board resolution that stripped COMMISSIONER COLLINS of her Board positions was based solely upon COMMISSIONER COLLINS' speech that was unequivocally exercised while she was an unelected private person some two (2) years before she was elected to the Board.

On March 24, 2021, DEFENDANTS drafted a "Resolution" to remove COMMISSIONER COLLINS from her position as Vice-President of the Board. Thereafter, with only 24-hour notice, DEFENDANTS hastily convened the Board to vote on their Resolution. The Board passed the resolution with five votes in favor and two votes against, with COMMISSIONER COLLINS and Board President Gabriela Lopez casting the two dissenting votes.

DEFENDANTS' actions were premised on a series of First Amendment protected tweets that were published nearly four and a half years prior when COMMISSIONER COLLINS was a private citizen and not yet a Board member or a government employee. The December 4, 2016 tweets were as follows:

1. Hey Twitter! Does anyone know about any news stories highlighting hate speech or bullying of Asian students? Please send them my way.

2. I'm looking to combat anti-black racism in the Asian community at my daughters' mostly Asian Am school.

3. Many Asian Ss and Ts I know won't engage in critical race convos unless they see how they are impacted by white supremacy.

4. I grew up in mostly Asian Am schools and know this experience all too well. Many Asian Am. believe they benefit from the "model minority" BS.

5. In fact many Asian American Ts, Ss, and Ps actively promote these myths. They use white supremacist thinking to assimilate and "get ahead".

6.Talk to many @thelowell parents and you will hear praise of Tiger Moms and disparagement of Black/Brown "culture".

MOTION FOR PRELIMINARY INJUCTION                                          3:21-cv-02272-CRB

2

7. I even see it in my FB timeline with former HS peers. Their TLs are full of White and Asian ppl. No recognition #BlackLivesMatter exists.

8. 2 [weeks]was ago, my mixed-race/Black daughter heard boys teasing a Latino about "Trump, Mexicans and the KKK." The boys were Asian- American.

9. She spoke up when none of the other staff did. The after-school counselor was Asian.

10. My best friend from school says she feels alone in the Chinese community. She feels ostracized when she speaks up against anti-black hate.

11. Where are the vocal Asians speaking up against Trump? Don't Asian Americans know they are on his list as well?

12. Do they think they won't be deported? profiled? beaten? Being a house n****r is still being a n****r. You're still considered "the help."

DEFENDANTS' "Resolution" singularly relied upon COMMISSIONER COLLINS' speech that she exercised prior to attaining her elected office which, due to the far reach of the internet, has significantly and irreparably injured and obstructed her ability to discharge her duties as a Board member and has caused irreparable injuries to her reputation as both an elected official and private citizen. The ramifications of DEFENDANTS' resolution have similarly hampered her ability to serve and effectively represent her constituents and the citizens of San Francisco.

This instant Motion for Order to Show Cause respectfully requests this Court to issue DEFENDANTS an Order to Show Cause why an injunction should not issue that would restore COMMISSIONER COLLINS to her rightful position as the Board's Vice-President and to each of her Board's committee assignments that she held prior to DEFENDANTS publicly penalizing her for her protected speech.

## II.      STATEMENT OF FACTS[1]

During the November 6, 2018 election, COMMISSIONER COLLINS was elected to the San Francisco Unified School District Board of Education, where she continues to serve as a Board commissioner. Out of the nineteen candidates who ran during the November 6, 2018 election, COMMISSIONER COLLINS was elected with a plurality of the votes cast, totaling 122,865

---

[1] Plaintiff hereby incorporate all facts stated in her Declaration, as fully set forth herein.

which represented 15% of the 817,920 total votes cast.[2] Declaration of Alison Collins, "Collins Dec." ¶8.

On March 23, 2021, at 2:30 p.m., DEFENDANT FAAUUGA MOLIGA announced on Twitter that "Commissioner Lam & I will be submitting resolution at 3/25 special meeting to remove Commissioner Collins as V.P. and from all Committees to which she is assigned." Collins, Dec. ¶9. In violation of SFUSD Board Rules and Procedures providing that items be placed on the agenda by the Board's President, DEFENDANT MOLIGA (1) forced Resolution No. 213-25A1 Assertion of No-Confidence ("Resolution") onto the Board's agenda, (2) moved said Resolution into a special closed session meeting, and (3) removed COMMISSIONER COLLINS from her position as Vice President and from her place on the Board's committees. Collins Dec. ¶9.

DEFENDANTS MOLIGA and LAM based the Resolution on tweets COMMISSIONER COLLINS had made as a private citizen some two years before being elected to the Board. Diane Yap, a Lowell High School alumna who was critical of a resolution COMMISSIONER COLLINS had authored seeking to open Lowell High School's enrollment to Black, Latinx, immigrant, and disabled students, had combed through years of COMMISSIONER COLLINS' tweets searching for any disparaging 'dirt' on COMMISSIONER COLLINS in order to politically attack her on account of her affirmative advocacy to increase diversity at Lowell High School. Collins Dec. ¶¶10, 11.

DEFENDANTS colluded with and conspired with Diane Yap on pursuing a media campaign intended to malign COMMISSIONER COLLINS despite Ms. Yap's own repeated expressions of racially disparaging statements against parents of Black and Latinx students, suggesting that these students were academically inferior and undeserving of enrollment at Lowell. Collins Dec. ¶11. DEFENDANTS MOLIGA and LAM's Resolution propagated false statements that slandered COMMISSIONER COLLINS' character while demanding her resignation from the Board. On March 19, 2021, DEFENDANT LAM called COMMISSIONER COLLINS and demanded her resignation from the Board, threatening that "if you do not resign, it will get messy!" COMMISSIONER COLLINS did not resign. The Resolution called for the removal of

---

[2] https://sfelections.sfgov.org/november-6-2018-election-results-summary

COMMISSIONER COLLINS as Vice President, and removal from membership in all committees on which she served. Collins Dec. ¶12.

On March 25, 2021, the Resolution was approved by a vote of 5-2. In so doing, DEFENDANTS caused irreparable injury to COMMISSIONER COLLINS by depriving her of the ability to effectively serve the entirety of the City's students and their parents, as well as the BIPOC ("Black, Indigenous, People of Color") community, in her role as Vice President and committee member. DEFENDANTS' illegal Resolution that unjustly penalized the only Black person on the Board, severely undermined COMMISSIONER COLLINS' ability to advocate for and introduce policies, measures and actions that were not only in the best interest of all the City's students and parents, but in particular for the BIPOC and other undeserved student populations and their parents. As COMMISSIONER COLLINS is one of the most active and accomplished members on the Board, DEFENDANTS' actions have also severally hampered the work she was elected to do and have additionally caused continued irreparable injury to her constituents. In the past two (2) years, COMMISSIONER COLLINS has drafted more resolutions focused on cultural equity and access than any other Board Commissioner and has rarely missed a meeting. Collins Dec. ¶13.

Additionally, and most compellingly, DEFENDANTS' Resolution has placed COMMISSIONER COLLINS and her family at substantial physical, political, professional and economic risk.[3]

DEFENDANTS' deprivation of COMMISSIONER COLLINS' private protected speech is unequivocally an irreparable injury because there exists no compelling governmental interest supporting DEFENDANTS' conduct that comparatively outweighs COMMISSIONER COLLINS' paramount First Amendment rights. With such paucity of rationale and legal justification for expressly violating COMMISSIONER COLLINS' protected speech, DEFENDANTS, as elected officials who swore to uphold the rights endowed in the Constitution, have intentionally failed to uphold such rights when penalizing COMMISSIONER COLLINS for her protected speech rights under the First Amendment. Collins Dec. ¶14.

---

[3] https://go.boarddocs.com/ca/sfusd/Board.nsf/files/BZFRPW6F035A/$file/Lam%20Moliga%20Assertion%20No-Confidence.pdf

Before the Board's vote on the illegal Resolution, COMMISSIONER COLLINS, along with President Gabriela López, protested and gave notice that the Board's proposed action was not only an express violation of the Board rules, but an unjustified deviation from the normal Board practices. COMMISSIONER COLLINS challenged whether DEFENDANTS had complied with the enumerated rules mandating the placement of a "Non-routine Matter" on the agenda.  Collins Dec. ¶17. Nevertheless, DEFENDANTS unapologetically ignored these objections voiced by both the Board's President and the Vice President. Collins Dec. ¶16.

The Board's mandatory rule provided that "non-routine matters ***shall*** generally appear on the...agenda for at least two (2) days prior to adoption…." However, the Resolution was introduced for a vote in only one meeting, and it was not introduced at a regular Board meeting but a special meeting which, in fact, was a Closed Session Meeting to discuss the interim superintendent. This mandatory rule was violated in every aspect, and such conduct summarily violated the Brown Act whose purpose is to ensure public transparency in decision making of district policies. See Board Rules and Procedures 9322 on Board Docs under the 'Policies' tab; Collins Dec. ¶17.

Additionally, COMMISSIONER COLLINS, along with President López, protested that the DEFENDANTS were violating the Board's Rule pertaining to crafting and ratifying the Board's agenda:

> "The Board President, Vice President, Superintendent, and/or designee(s) shall review the agenda before it is printed and shall have final authority over whether each item on the agenda is placed in accordance with Board policy. At his/her discretion the president may delay placing a resolution for first reading on the agenda for not more than one (1) meeting if there are more agenda items than are manageable." *Id.*

Collins Dec.¶19.

Specifically, before the Resolution vote was taken during the March 25th board meeting  in order to strip COMMISSIONER COLLINS of her position and committee assignments, COMMISSIONER COLLINS, at 1:23:03 video recording time,  objected to and protested against DEFENDANTS' actions. Collins Dec. ¶20. During the March 25th board meeting and before the vote to approve the Resolution, President López, at 1:27:44 video recording time,  also noted the irregularity of the process by commenting that the means by which DEFENDANT MOLIGA had

pushed the Resolution onto the agenda circumvented her Presidential leadership authority. Collins Dec. ¶21.

In fact, throughout the preceding two (2) years that COMMISSIONER COLLINS had served on the Board, at no time had a "non-routine matter" been placed on the agenda via a Tweet. Collins Dec. ¶22.  As stated above, President López and COMMISSIONER COLLINS strongly opposed and protested the impropriety of placing the constitutionally infirm Resolution on the Board's agenda as it was in express disregard of the following Board Rule:

> "Agenda Preparation. The Superintendent shall develop the agenda for each regular and special meeting in accordance with Board policy. Each agenda shall reflect the district's vision and goals and the Board's focus on student learning."

However, in their rush to judgment and with a transparent aim to garner political advantage, DEFENDANTS ignored both President Gabriela's admonition and COMMISSIONER COLLINS' protest that DEFENDANTS' actions were in express violation of not only the procedural rules and protocols, but in the Board's expressly stated core mission that, "each agenda shall reflect the district's vision and goals and the Board's focus on student learning". Collins Dec.¶ 12.

Nevertheless, the Resolution, whose effect was to expressly violate COMMISSIONER COLLINS right to protected speech, was added to the Board's agenda by way of the highly irregular, unlawful and preposterous means of a Tweet from DEFENDANT MOLIGA'S Twitter account. Collins Dec.¶ 23. The illegal Board Resolution was drafted in the following manner: (Exhibit A, Collins Dec.24 ¶).

**SFUSD BOARD RESOLUTION NO. 213-25A1 ASSERTION OF NO-CONFIDENCE**

"For Adoption on Suspension of the Rules at First Reading

Subject: Resolution No. 213-25A1 Assertion of No-Confidence - Commissioners Jenny Lam and Faauuga Moliga

WHEREAS: Elected officials are community leaders, and students and their families look to them for guidance; and

WHEREAS: The inflammatory statements made by Commissioner Collins towards the Asian American community in 2016 perpetuate gross and harmful stereotypes and leave no room for nuance or potential misunderstanding; and,

WHEREAS: Our relationship with elected officials must be predicated on mutual respect, and when our elected officials falter, we are faced with the difficult decision of how to hold them accountable; and

WHEREAS: When the social media comments resurfaced, what mattered most was that she, as a leader and elected official, accept responsibility and atone for the trauma inflicted on the community by her words; and

WHEREAS: Although Commissioner Collins has acknowledged that her words may have caused pain, her public statements to-date have fallen short of sincere recognition of the harm she has caused and Vice President Collins does not seem to take meaningful responsibility for her actions.

THEREFORE, BE IT RESOLVED: That on behalf of the 54,000 thousands of students in the San Francisco Unified School District, the Senior Administrative Staff, the elected officials representing all levels of San Francisco government who have requested that Commissioner Collins resign, the Commissioners of the San Francisco Board of Education have lost confidence in Commissioner Collins and her ability to focus on the pressing needs of the district at this time; and

FURTHER BE IT RESOLVED: That should Commissioner Collins not resign, the San Francisco Board of Education moves to remove her from her leadership position as Vice President and from all committees of the San Francisco Board of Education for the duration of her term; and

BE IT FURTHER RESOLVED: That the focus of the San Francisco Board of Education is the equitable re-opening of schools for our students, the health and safety of our faculty, staff, administrators, students, and families, and ensuring the financial stability of the district.

Special Meeting 3/25/21" Collins Dec. ¶26.

## IRREPARABLE INJURY

**Irreparable Injury Caused by Stripping COMMISSIONER COLLINS of Her Position as Vice President And Committee Memberships:**

DEFENDANTS' Resolution caused COMMISSIONER COLLINS the following irreparable injuries:

1.  Stripping COMMISSIONER COLLINS of her unanimously elected position as Board Vice-President and committee membership where DEFENDANTS' conduct was without a compelling governmental reason that outweighed COMMISSIONER COLLINS' paramount First Amendment rights as a private, non-governmental employee;

MOTION FOR PRELIMINARY INJUNCTION

3:21-cv-02272-CRB

2.  Denying COMMISSIONER COLLINS due process without adequate notice and opportunity to prepare a meaningful response to DEFENDANTS' Resolution;

3.  Invading COMMISSIONER COLLINS' right of Privacy under both Article 1, Section 1 of the California Constitution and the Fourth Amendment of the United States Constitution by publicizing and propagating a matter of employment relations;

4.  Precluding COMMISSIONER COLLINS from executing the roles and responsibilities delegated to her as Vice-President as outlined in Board Rule and Procedure 9121.1. "The Board Rule and Procedure 9121.1 states: "Vice President. This Rule and Procedure applies to the San Francisco Unified School District and the County Office of Education. In addition to performing the duties of the Board of Education's President in the President's absence, and assuming the office of the President in the event the president leaves office before his/her term is expired, pursuant to Board Rules and Procedures 9121, the Vice President shall also preside at all meetings of the Committee of the Whole, Closed Session and at other meetings as designated by the President in accordance with Board rules;"

5.  Precluding COMMISSIONER COLLINS from participating in joint S.F. City and S.F. Board of Education meetings as the Board's representative. This includes serving on the SF Board of Supervisors RISE Task Force to which she was told by the President she would be assigned to serve. This important city task force plans to define a city district partnership to support philanthropic investment in public education. This is work that COMMISSIONER COLLINS has been shepherding since before she was on the Board. Due to DEFENDANTS' conduct, she is now effectively removed from a body whose work she was pivotal in advancing;

6.  Precluding COMMISSIONER COLLINS from participating in reviewing the Board's agendas where under Board Rule 9322, the Vice President is to work with the Superintendent, Deputy Superintendents and Board President each week to determine items for the agenda. Determining items for the agenda helps drive policy discussions. COMMISSIONER COLLINS is deprived of this imperative determination that fundamentally sets the district's priorities;

7.  Precluding COMMISSIONER COLLINS from attaining the position of Board President, where holding the position of Vice-President usually leads to the appointment as Board President. In holding the position of Vice President, COMMMISSIONER COLLINS was undoubtedly in line to become Board President in the upcoming year which constitutes COMMISSIONER COLLINS' last term in office. It is a common practice to elevate the Board Vice President to President the following year. Despite COMMISSIONER COLLINS obtaining a record of achievement in her role as Board Vice President, the Board's unlawful action now means it is extremely unlikely COMMISSIONER COLLINS will be Board President during COMMISSIONER COLLINS' last term of office. Thus, as an overt act in furtherance of DEFENDANTS' plan, scheme, agreement and conspiracy, DEFENDANT LAM nominated DEFENDANT MOLIGA to be Vice President. DEFENDANTS LAM and MOLIGA drafted the resolution to remove COMMISSIONER COLLINS and have positioned themselves to be next in line. This blatant and unlawful power grab illustrates that they clearly understand the real and perceived value of the office. DEFENDANTS conspired to use COMMISSIONER COLLINS' private, pre-elected tweets in order to spread malicious lies about COMMISSIONER COLLINS' character in order for them to advance politically;

8.  Precluding COMMISSIONER COLLINS to speak as the Board President's representative as otherwise afforded the Vice President under Board Rule 9121.1 and, as a result, COMMISSIONER COLLINS is no longer authorized to speak on behalf of or as the Board President's voice;

9.  Precluding COMMISSIONER COLLINS from chairing Board committee meetings and other contiguous meetings as delegated to the office of Vice-President pursuant to SFUSD and County Office of Education Rule and Procedure 9121.1 wherein the Vice President "shall also preside at all meetings of the Committee of the Whole, Closed Session and at other meetings as designated by the President in accordance with Board rules." Such preclusion effectively strips COMMISSIONER COLLINS of setting the meeting agendas and thereby the priorities that come before the Board;

MOTION FOR PRELIMINARY INJUCTION
3:21-cv-02272-CRB

10. Diminishing COMMISSIONER COLLINS' overall contributions to the Board due to her having been stripped of the highly visible and impactful position of Board Vice President and instead crediting the accomplishments she had thus far achieved in that role to others on the Board;

11. Subjecting COMMISSIONER COLLINS to gender bias with the appointment of DEFENDANT MOLIGA as Board Vice-President, given that MOLIGA's past conduct has shown a bias against and an affirmative undermining of female Commissioners' leadership;

12. Diminishing COMMISSIONER COLLINS' future political and employment opportunities due to DEFENDANTS' unlawful actions that have been disseminated through the media far and wide.

Collins Dec. ¶ ¶29-39.

**Irreparable Injury Caused to COMMISSIONER COLLINS' Constituents by Stripping COMMISSIONER COLLINS of Her Role as Vice President and Committee Memberships:**

The following paragraphs articulate the irreparable harms that have befallen both COMMISSIONER COLLINS and the constituency whom she represents and who wholeheartedly depend on her advocacy for their interests and well-being to be protected and advanced.

(1) By holding the position of Vice-President, COMMISSIONER COLLINS was in a well situated position to better support the Board's President. Both COMMISSIONER COLLINS and Board President López ran for Board positions together, and after receiving both the highest and second highest number of votes during the Board election, firmly supported one another on the Board. They were aligned in supporting racial justice in their district. They are both seasoned educators who understand educational pedagogy. They are also strong voices for Black and Brown families in the district and for site-based educators. Many of their voters voted for them as a team. Because of DEFENDANTS' conduct, COMMISSIONER COLLINS is now deprived of the ability to support President López and effectively advocate on behalf of their shared priorities. In now holding the position of Board Vice President, DEFENDANT MOLIGA has repeatedly undermined President López' leadership which has detrimentally impacted COMMISSIONER COLLINS'

effectiveness as an elected official and by extension, her and President López's shared constituency.

Collins' Dec. ¶40.

(2) As a Black mother and educator, COMMISSIONER COLLINS' leadership means representation for constituents who seldom have a seat at the table. Removing COMMISSIONER COLLINS from Board Leadership means removing an important voice from spaces that are often unwelcome to communities of color and Black women's perspectives. Collins Dec. ¶41;

(3) Removing COMMISSIONER COLLINS from Board committee assignments has resulted in silencing her ability to debate and/or vote on the particular issues addressed by the committees she previously served, i.e., Board committees on Policy, Ad Hoc Student Assignment System, and Building and Grounds. As the only Black SFUSD parent who has children currently enrolled in the district, COMMISSIONER COLLINS brings a vitally important voice to Board questions of enrollment which, given the district's current charge of decreasing racial segregation in S.F. schools, is imperative. Collins Dec. ¶42;

(4) By removing COMMISSIONER COLLINS' voice from Board committees, all S.F. constituents are gravely harmed because the committees are now only served by two Board members rather than three, which exponentially reduces the extent to which the committee's decisions are sufficiently informed. Collins Dec. ¶42;

(5)    When considering that COMMISSIONER COLLINS worked closely with the Board President when determining committee assignments so that the Board Leadership (both President and Vice President) were well informed regarding all actions taken by the Board's various committees, the absence of COMMISSIONER COLLINS in that leadership position has not only directly impacted her duties but has also impacted the efficient function of the Board in its entirety. Collins Dec. ¶43.

(6) The impact on COMMISSIONER COLLINS' constituency is reflected in a constituent parent's statement to the Board protesting the Board's Resolution. District parent leader Rionda Batiste, a Black parent leader serving on the African American Parent Advisory

council provided the following testimony at the March 25, 2021 meeting stating:

> "Today I'm deeply saddened by the actions of this board. I was filled with hope when the board spoke up in support of Black lives. I honestly felt that for once, Black lives really mattered to SFUSD. However, I am reminded once again to Black lives do not matter. I heard specifically a calling out that the Black population is only 13%. So does that mean that our 13% no longer matters? I'm also reminded, that despite the statement to the opposite, that restorative practices mean nothing to SFUSD. Removing Alison from her position as VP and from her committees will only negate all the hard work that Alison has done, and continues to do for all of our babies. Despite the fact that Black students and our families within this district make up a small number, we *do* matter." Collins Dec.¶ 44.

(7) COMMISSIONER COLLINS suffers irreparable injury because her constituents have been detrimentally impacted as a result of DEFNDANTS' rush to censure COMMISSIONER COLLINS by way of their Resolution. COMMISSIONER COLLINS' constituents were given a mere two days to decipher DEFNDANTS' Resolution and to provide oppositional input to the Board. As stated in Board Rules and Procedures 9322: "A Board member or member of the public may request that a matter within the jurisdiction of the Board be placed on the agenda of a regular meeting. The request shall be in writing and be submitted to the Superintendent or designee with supporting documents and information, if any, at least seven days before the scheduled meeting date. Items submitted less than seven days before the scheduled meeting date may be postponed to a later meeting in order to allow sufficient time for consideration and research of the issue." Collins Dec. ¶45-46

(8) Because DEFENDANTS 'officially' deprived COMMISSIONER COLLINS of her Board position and consequent responsibilities, irreparable injuries have ensued wherein COMMISSIONER COLLINS can no longer serve her constituents from a position of Board leadership. In accordance with Board Rules and Procedures 9121, "In addition to performing the duties of the Board of Education's President in the President's absence, and assuming the office of the President in the event the president leaves office before his/her term is expired, pursuant to Board Rules and Procedures 9121, the Vice President shall also preside at all meetings of the Committee of the Whole, Closed Session and at other meetings as designated by the President in accordance with Board rules." Collins Dec. ¶46.

**Irreparable injury caused to COMMISSIONER COLLINS and COMMISSIONER COLLINS' family by maligning her character and making COMMISSIONER COLLINS a target of harassment and physical and economic attacks:**

By drafting and placing a Resolution on the Board's agenda whose express purpose was to publicly censure COMMISSIONER COLLINS for protected speech exercised prior to her assumption of public office, DEFENDANTS essentially placed COMMISSIONER COLLINS' character and reputation on the agenda by more than inferentially designating her as not only a racist but someone who is being scapegoated for the entirety of Anti-Asian hate speech and violence that has flared up across the nation. DEFENDANTS' Resolution has impacted and injured COMMISSIONER COLLINS in the following manner: Collins Dec. ¶47.

a. **Toxic workplace environment**—In every Board meeting since March 23rd, 2021, DEFENDANTS have effectively sanctioned and thereby invited direct harassment and slander of COMMISSIONER COLLINS' character. Prior to permitting public comment at every Board meeting since COMMISSIONER COLLINS' censure, Board staff have consistently and regularly directed the public to "refrain from naming employees or community members by name." Such practice was flagrantly disregarded during public comment periods pertaining to the shaming of COMMISSIONER COLLINS. In fact, DEFENDANTS MOLIGA and LAM went so far as to criticize President López for refusing to expand the time allotted to public comment which included threats, like the following captured by <u>ABC7 News</u>[4]. Collins Dec. ¶47(a).

> "Regardless of whether you choose to do the right thing and resign or not, you will pay the ultimate price and that's the loss of your dignity and your reputation. For the rest of your life, you will be haunted by your actions, wherever you go people will see you for what you really are - a racist," said a resident."

b. **Damage to professional relationships** — DEFENDANTS' actions have resulted in creating an internal Board environment where staff have been made to feel uncomfortable in their interactions and communications with COMMISSIONER COLLINS. The projects that COMMISSIONER COLLINS' spearheaded, i.e., resolutions pertaining to Lowell High School and Equity Studies, have been significantly stymied and are moving forward with great difficulty. Collins Dec. ¶47(b).

---

[4] https://abc7news.com/sfusd-board-vp-alison-collins-asian-tweets-anti/10444050/

c. **Social ostracization and exclusion** —By expressly stating in their Resolution that COMMISSIONER COLLINS is perpetuating "gross and harmful stereotypes", DEFENDANTS have publicly and officially labeled COMMISSIONER COLLINS as a racist. This is an irreparable injury to COMMISSIONER COLLINS' reputation as a Board member, community leader, and as a member of a political and social network that affirmatively opposes racism. COMMISSIONER COLLINS' social network is replete with community members who engage in education and local politics. DEFENDANTS' resolution that effectively labelled COMMISSIONER COLLINS as racist is unequivocally an irreparable injury. Collins Dec. ¶47(c).

d. **Slandering COMMISSIONER COLLINS' professional reputation** DEFENDANTS' Resolution caused COMMISSIONER COLLINS irreparable injury in that, due to its provocative language, the Resolution's passage generated worldwide media attention that stretched throughout the United States, Europe and the South Pacific. The entirety of these media reports either directly or inferentially designated COMMISSIONER COLLINS as a racist. DEFENDANTS' slanderous Resolution has also found representation on <u>Wikipedia</u> which perpetuates these injurious false narratives. Collins Dec. ¶47(d).

e. **Destruction of COMMISSIONER COLLINS' political future —** In affirming the Resolution, DEFENDANTS have ratified lies about COMMISSIONER COLLINS which have resulted in the diminishment of COMMISSIONER COLLINS's ability to run for a subsequent Board seat or for any other office or commission, not only in San Francisco, but nationwide. Collins Dec. ¶47(e).

f. **Damage to professional opportunities** — Even if COMMISSIONER COLLINS chooses not to run for future office, Google searches will now and continue to produce a multitude of articles, blogs, and news reportage that references DEFENDANTS' resolution and affirmative vote which falsely designates and infers that COMMISSIONER COLLINS is in fact a racist. COMMISSIONER COLLINS has spent over 20 years working as an advocate in the public education sector, specifically working on promoting social justice and equal educational access. Such a diametrically opposite labeling of COMMISSIONER COLLINS' identity and disposition could not be further from the truth of COMMISSIONER COLLINS' unwavering record of

tirelessly working to eradicate racism in the domain of public education. Such record is reflected throughout COMMISSIONER COLLINS' work as an education consultant who led programs and teachings on anti-racism, as well as having provided coaching on the same subject to leaders in both the education and community organizing fields. Due solely to DEFENDANTS' conduct, COMMISSIONER COLLINS' resume is irredeemably tarnished and defamed. There is reasonably no manner by which COMMISSIONER COLLINS' reputation can be repaired, given the irreparable harm caused by DEFENDANTS' Resolution, and she will be perpetually required to respond to attacks to her integrity, character and ideological inclination. As a result, COMMISSIONER COLLINS' injury is one of a perpetually irreparable nature. Collins Dec. ¶ 47(f).

g. **Physical risk to COMMISSIONER COLLINS and COMMISSIONER COLLINS' children and family** - Several weeks ago, COMMISSIONER COLLINS  was in the neighborhood market with her daughter shopping for food for her family. As she was leaving the store, a stranger queried COMMISSIONER COLLINS if she was "Alison Collins." She answered, "Yes," to which the stranger aggressively responded, "Fuck you!" This experience, as well as the appearance of several individuals including a man standing outside COMMISSIONER COLLINS' private home doorway carrying a sign that said, "Resign" in reference to last fall's Board unanimous vote to temporarily suspend selective enrollment due to lack of grades and standardized test scores resulting from the Covid quarantine. Such incidents have provided COMMISSIONER COLLINS reasonable grounds to worry with anxiety regarding her own safety, as well as the safety of her children and husband, both within the privacy of their own home or when out in public. COMMISSIONER COLLINS' fear for her children's and family's safety has exponentially increased. The teachers of COMMISSIONER COLLINS' children have reached out to COMMISSIONER COLLINS and expressed interest in supporting her girls' physical and emotional well-being.  Collins Dec.¶47(g).

DEFENDANTS' Resolution has caused irreparable injury to COMMISSIONER COLLINS in that it has inflamed and perpetuated increased attacks on President López and COMMISSIONER COLLINS because of their advocacy for equity in education, specifically at

Lowell High School. Last fall, COMMISSIONER COLLINS and President López were targeted by hate speech. Ida Mojadad of the S.F. Examiner wrote an article titled: <u>"Angered by Lowell decision, SFUSD grad targets school board members with violent imagery</u>[5]—Facebook page depicts two women of color on board with swastikas and x-marks on their faces: The following is an image that appeared in a video uploaded to  a Facebook site:  Collins Dec. ¶47(h).



COMMISSIONER COLLINS is an experienced educator and community organizer who has worked for education equity in San Francisco for more than 20 years. As a former high school English teacher and instructional coach, COMMISSIONER COLLINS has also conducted professional development for hundreds of educators across the Bay Area on topics such as bullying, anger management, and conflict resolution skills. (Collins Dec. ¶¶47-48). She provided informed development for the anti-bullying curriculum adopted by Groundspark and was a contributing author to the Peer Resources Peer Leader Training curriculum. She also co-authored a curriculum used by UC Berkeley's TRIO programs to assist low-income first-generation college bound students to access higher education. (Collins Dec. ¶¶47-48) COMMISSIONER COLLINS is committed to giving back to the public education system that helped her mother rise out of

[5] https://www.sfexaminer.com/news/angered-by-lowell-decision-sfusd-grad-targets-school-board-members-with-violent-imagery/

MOTION FOR PRELIMINARY INJUCTION                                          3:21-cv-02272-CRB

poverty and helped COMMISSIONER COLLINS' father become one of the first Black professors at UCLA. Collins Dec. ¶¶49-51.

COMMISSIONER COLLINS holds a master's degree in education from San Francisco State University. Both of her children attend SFUSD schools. (Collins Dec. ¶50) She has authored or co-authored many resolutions, and contrary to those voices who benefit from stoking antagonism between the Asian American and Black community, holds strong support from the Asian American community in San Francisco. Collins Dec.¶52.

## III.    ARGUMENT[6]

As an elected official, COMMISSIONER COLLINS represents the constituents who elected her. Her constituents entrusted her to carry forth an agenda that faithfully represents and advocates for their interests. Collins Dec. ¶¶40, 41, 44. Because of DEFENDANTS' conduct that expressly trampled upon COMMISSIONER COLLINS' right to freely express her views, COMMISSIONER COLLINS has incurred irrevocable harm in that her chilled speech has resulted in greatly diminishing her ability to advocate on behalf of her constituency, as well as to enact her constituency's policy agenda. Collins Dec. ¶42

Due to DEFENDANTS' conduct and as the above recitation of harms makes plain, COMMISSIONER COLLINS has now been prohibited from and/or limited in undertaking her elected duties in which she would have otherwise been able to engage had DEFENDANTS chosen to not intentionally violate COMMISSIONER COLLINS' protected speech rights. Collins Dec. ¶¶32, 33, 34, 38. DEFENDANTS have thus effectively subverted COMMISSIONER COLLINS' ability to fully express her views and opinions, as well as her constituency's ability to have their views and opinions represented by their elected Board member. Collins Dec. ¶¶40, 41, 42, 46.

COMMISSIONER COLLINS seeks an order to show cause why this Court should not issue a preliminary injunction that would prevent the Board from carrying out the intended and stated purpose of Resolution No. 213-25A1 and rightfully return COMMISSIONER COLLINS to her prior committee and leadership positions.  By prohibiting DEFENDANTS from implementing Board Resolution No. 213-26A1, this Court would be maintaining the status quo during the

---

[6] Plaintiff hereby incorporates all of the facts and causes of action in her Complaint for Damages. (Docket 1)

pendency of this action and thus, effectively prevent COMMISSIONER COLLINS from suffering further irreparable harm.   If the Court does not issue the preliminary injunction and COMMISSIONER COLLINS succeeds in her action, she will have missed out on opportunities that are only provided by assuming the role of Vice President that would enable her to effectively and freely speak and advocate on behalf of the constituents she was elected to represent. Collins Dec. ¶¶40, 42, 46. By the time the Court rules that Board Resolution No. 213-26A1 is void because it violates COMMISSIONER COLLINS ' First Amendment free speech rights, COMMISSIONER COLLINS, as well as her constituency, will have suffered profound and irreparable harm on account of being stripped from holding the position of Vice President, as well as having to relinquish participation in the particular Board committees where her contribution and direction are irreplaceable. Collins Dec. ¶¶34, 35, 42.

## A.  Legal Standard

The grant or denial of a motion for a preliminary injunction lies within the discretion of the district court, and its order will be reversed only if the court relied on an erroneous legal premise or had otherwise abused its discretion. *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). The district court is charged with basing its decision upon consideration of the relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971). Thus, a court will be reversed were it to apply an incorrect preliminary injunction standard, *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 314-15 (9th Cir. 1978) or if the court misapprehends the law with respect to the underlying issues in the litigation. *Sports Form*, 686 F.2d at 752(abuse of discretion also exists where the court rests its conclusions on clearly erroneous findings of fact).

## B.  Application of the Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to preserve the positions of the parties until a full trial can be conducted. *Iconix, Inc. v. Tokuda* (N.D.Cal. 2006) 457 F.Supp.2d 969, 974.) The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits. *L.A. Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). The

moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Id.* at 1201. These are not separate tests, but the outer reaches 'of a single continuum.'" *L.A. Coliseum*, 634 F.2d at 1201.

Under the sliding scale theory, a party seeking an injunction "need not demonstrate that he will succeed on the merits but must at least show that his cause presents serious questions of law worthy of litigation." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993). "Serious questions" are those which are "substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Senate of State of Cal. v. Mosbacher*, 968 F. 2d 974, 977-78 (9th Cir. 1992), *citing Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991)); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("serious questions refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo."). Although the serious questions posed by the movant "need not promise a certainty of success, nor even a probability of success," he or she must nevertheless demonstrate a "fair chance of success" on the merits. *Gilder,* 936 F.2d at 422. Finally, in cases where the public interest may be affected, the court must consider the public interest as a factor in balancing the hardships. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760, 766 (9th Cir. 2004), *citing Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir. 1992).

In this case, the status quo is the position COMMISSIONER COLLINS enjoyed before the retaliatory actions by the Board that stripped her of her leadership and committee positions.  "[T]he status quo is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc*., 448 F.3d 1118, 1124 (9th Cir. 2006), *quoting GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1210 (9th Cir. 2000)). In *GoTo.Com*, a trademark infringement case, the Ninth Circuit held that the status quo which was to be preserved by the district court's preliminary injunction "existed before [the defendant] began using its allegedly infringing logo." *GoTo.Com*, 202 F.3d at 1210.

In this case, the status quo would be the condition that existed before the Board illegally voted to strip COMMISSIONER COLLINS of her Board positions that was a decision based exclusively and expressly on MRS. COLLINS' protected speech.

### 1. COMMISSIONER COLLINS Can Demonstrate That She Will Likely Succeed On The Merits Of Her First Amendment Claims

COMMISSIONER COLLINS brings her action under 42. U.S.C. §1983, alleging that the individual School Board members retaliated against her for her protected speech. COMMISSIONER COLLINS' analysis starts with the well-established understanding that a public employer "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383(1987). Since the resolution in question explicitly states that the basis for DEFENDANTS' action was COMMISSIONER COLLINS' 2016 statements, there is no question that the Board's action was based on COMMISSIONER COLLINS' speech.

At the time that COMMISSIONER COLLINS engaged in her protected speech, she was not an elected Board member of the S.F. School Board, but rather a private citizen engaging in a civil discussion about race relations in a particular San Francisco public school, as well as within the school system in general.  Since COMMISSIONER COLLINS was neither a Board member, a State or City employee, nor an agent of the Board (or any other State or City entity) at the time she spoke on a matter of public concern, the allowances afforded government employers to limit the speech of government employees do not apply.

Nevertheless, in applying the standards for analyzing whether speech exercised by a government employee is protected when said speech is communicated within the context of the employee's work environment, COMMISSIONER COLLINS' speech, when analyzed from this perspective, would still show a reasonable likelihood of success.

Thus, in the context of a government employee alleging retaliation for speech made while a government employee, the Ninth Circuit employs the *Pickering* five-step analysis: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for

1   treating the employee differently from other members of the general public; and (5) whether the

2   state would have taken the adverse employment action even absent the protected speech. *Eng v.*

3   *Cooley* (9th Cir. 2009) 552 F.3d 1062, 1070.

4          This test is designed for a situation where the employer/employee relationship is in effect

5   at the time of the subject speech. See, e.g, *Id.* at 1064. (the *Eng* plaintiff was a deputy district

6   attorney when he engaged in the speech that was the subject of his lawsuit); *Pickering v. Bd. of*

7   *Educ.* 391 U.S. 563, 564(1968) (the *Pickering* plaintiff was a High School teacher dismissed from

8   his position for sending a letter to a local newspaper.)

9          In the context of a current employee engaging in speech, the *Pickering* balancing test makes

10  sense.  As the Supreme Court stated, "[t]he problem in any case is to arrive at a balance between

11  the interests of the [public employee], as a citizen, in commenting upon matters of public concern

12  and the interest of the State, as an employer, in promoting the efficiency of the public services it

13  performs through its employees." *Id.* at 568.

14         In the case at bar, however, the speech that DEFENDANTS relied upon to strip

15  COMMISSIONER COLLINS of her leadership and committee assignments occurred in 2016,

16  some two years prior to her election to the School Board. Thus, in this context, there is no

17  application for the *Pickering* test because the speech was not made by a government employee in

18  a context where the government would have otherwise held a reasonable level of control over her

19  speech.

20         However, as argued, were the Court to apply the balance of the *Pickering* factors,

21  COMMISSIONER COLLINS can still show that she is likely to prevail.

22         First, COMMISSIONER COLLINS bears the burden of showing that her speech addressed

23  an issue of public concern.  *Eng* 552 F.3d at 1070.  The public concern inquiry is purely a question

24  of law.  *Id.*  "Speech involves a matter of public concern when it can fairly be considered to relate

25  to 'any matter of political, social, or other concern to the community. *Id.* As COMMISSIONER

26  COLLINS' speech specifically addressed the well documented bullying and/or hate speech

27  impacting Black and Brown students, said speech, as a matter of law, involves a matter of public

28  concern.

Second, COMMISSIONER COLLINS bears the burden of showing the speech was spoken in the capacity of a private citizen, not a public employee. *Id.* at 1071. Again, this element is undeniable as a matter of law since COMMISSIONER COLLINS was not on the School Board in 2016 when she published her 2016 tweets as a private citizen.

Third, COMMISSIONER COLLINS must show that the School Board and its members took adverse employment action. *Id.* Again, DEFENDANTS and the Board explicitly stated that its action was taken to expressly punish COMMISSIONER COLLINS for her 2016 speech and because she would not resign on account of said speech.

With the fourth step, the burden shifts to DEFENDANTS to prove that their legitimate administrative interests outweigh the employee's First Amendment rights. In this case, there is no "administrative interest." DEFENDANTS cannot show that, were COMMISSIONER COLLINS to remain in her committee and leadership roles, such state of affairs would have "some potential to affect the entity's operations." *Garcetti,* 547 U.S. at 418.

As COMMISSIONER COLLINS was elected by her constituency and not by DEFENDANT Board members, her fitness to serve was by no means relegated to DEFENDANTS' individual judgment. As a result, since DEFENDANTS cannot remove COMMISSIONER COLLINS from her elected position, it is well within COMMISSIONER COLLINS' prerogative to either resign or remain on the Board. But for reliance upon speech exercised as a private citizen some two years prior to COMMISSIONER COLLINS' election to the Board, the DEFENDANTS had no reason for holding that COMMISSIONER COLLINS was undertaking her Vice Presidency in an unsatisfactory or deficient manner so that DEFENDANTS could hold a reasonable belief that the Board's operations would be impacted if COMMISSIONER COLLINS maintained her leadership and committee positions.

Lastly under Pickering, the government has the burden of demonstrating that it would have reached the same decision in the absence of the employee's protected conduct. *Id.* at 1072. DEFENDANTS clearly will not be able to establish this element as the record reflects that COMMISSIONER COLLINS was performing her duties in a more than satisfactory manner.

COMMISSIONER COLLINS' speech was the one and only reason for the retaliation. Thus, under a Pickering analysis, COMMISSIONER COLLINS prevails.

If in fact the *Pickering* analysis is indeed inappropriate, as is a reasonable conclusion given the facts at bar, the Court must resort to the traditional analysis of how and when the government can limit speech of its citizens.  There are several factors that courts consider since "speech is not wholly protected from government regulation in all places." *Frisby v. Schultz* 487 U.S. 474, 479(1988). Primarily, the location of the speech is highly relevant to the degree of protection afforded. *Id.* ("to ascertain what limits, if any, may be placed on protected speech, we have often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ.")

In this case, the speech was made over Twitter, a social media platform designed to foster community discussions regarding matters of public concern. Given that Twitter reasonably falls within the category of public forum, COMMISSIONER COLLINS' reliance a social media forum like Twitter should provide COMMISSIONER COLLINS' speech with the highest degree of protection. *See, Perry Ed. Assn. v. Perry Local Educators' Assn.* 460 U.S. 37, 45(1983)(speech uttered in a traditional public forum is afforded the highest degree of protection from state regulation.)   In, *Perry* the plaintiff sought access to the interschool mail system and teacher mailboxes which was denied him on account that such forums were delegated to a rival union. *Id.* at 41.  In ruling that "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public," the Supreme Court held "a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46.

Here, the speech at issue was a tweet on Twitter.  Twitter, and other forms of social media communications are the modern-day equivalents of a mail system, where the user can send a message directly to those with whom she or he is in communication.  In this case, the purpose of the tweet was to discuss issues of race in the S.F. public schools and how it impacts minority students of different racial and ethnic backgrounds. Since the School Board expressly retaliated against COMMISSIONER COLLINS for her speech, DEFENDANTS will have to show that their actions were narrowly tailored to effectuate a compelling state interest.  *Id.*  Given the age and

context of COMMISSIONER COLLINS' tweets and the fact that she was elected after making the tweets, DEFENDANTS will not be able to meet this burden. If the tweets dispositively disqualified COMMISSIONER COLLINS as a School Board member, the correct solution is an electoral recall, not a unilateral retaliatory action by the DEFENDANT Board members.

**2.   COMMISSIONER COLLINS Can Demonstrate That Significant Irreparable Harm Will Flow From Defendants' Conduct**

The second factor in a preliminary injunction analysis is the possibility of irreparable injury. *L.A. Coliseum*, 634 F.2d at 1201.  The Supreme Court has repeatedly held that the basis for injunctive relief in the federal courts has always been an irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero-Barcelo* 456 U.S. 305, 312(1982).  It is well settled that the loss of First Amendment freedoms for even "minimal periods constitutes irreparable injury justifying the grant of a preliminary injunction [or a temporary restraining order]." *Elrod v. Burns*, 427 U.S. 347, 373(1976) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") "So too, direct penalization . . . of First Amendment rights constitutes irreparable injury" for the purposes of granting temporary injunctive relief. *Id*. In the Ninth Circuit, a party seeking preliminary injunctive relief in a First Amendment context "can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002).

In this case, COMMISSIONER COLLINS respectfully directs this Court to COMMISSIONER COLLINS' exhaustive recitation of the manner in which the stripping of her role as Board Vice-President and her committee assignments irreparably injured both her own personal ambition of obtaining the most effective means and position by which to serve and forward the needs of her community, Collins Dec. ¶¶ 33, 34, 35, 38, as well as severely curtailing her  ability to effectively carry out her role as a Board member who was drawn to elected office out of a heart felt and passionate drive for achieving equity and inclusivity for the next generation. Collins Dec. ¶¶ 29, 33, 34, 35, 40, 42.

The overarching consideration with respect to 'irreparability' as it reflects upon COMMISSIONER COLLINS' injuries is the fact that as an elected Board member,

COMMISSIONER COLLINS term of office is fixed and with each day passing, she is irretrievably losing opportunities to advance, not only her own personal objectives as a Board member, but those policies, programs, and objectives that she had promised her constituency, (and upon whom they relied), that she would tirelessly work to accomplish. Thus, each day that COMMISSIONER COLLINS serves her term of office without the benefit of her rightfully appointed position as Board Vice-President and membership in her Board committees, COMMISSIONER COLLINS is irreparably being denied the opportunity to partake in the enumerated duties that such Board positions hold, as well as obstructing her ability to avail herself of the benefits and opportunities that derive from such positions. Therefore, the injuries COMMISSIONER COLLINS has incurred and continues to incur are indeed 'irreparable' with the passing of each consecutive day.

Specifically, on account of DEFENDANTS' action of stripping away COMMISSIONER COLLINS' Vice Presidency position and committee assignments, COMMISSIONER COLLINS has sustained the irreparable harm of, first and foremost, being punished solely on account of her exercising her First Amendment freedoms and the chill that such punishment has and will continue to exert on COMMISSIONER COLLINS' public life as an elected official. *Elrod,* 427 U.S. at 373("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); Collins Dec. ¶¶ 29. The stripping of the Vice-Presidency now precludes COMMISSIONER COLLINS from not only holding this extremely visible and impactful position whose status immeasurably afforded her constituency a heightened and powerful voice on their behalf, but from having a voice in setting the Board of Education's agenda, which is integral in setting the Board's policy directions. Collins Dec. ¶34 Thus, COMMISSIONER COLLINS' ability to advance policies that explicitly enhance inclusivity and racial justice within the school system is acutely diminished. As the Commissioner who holds the seat of Vice President regularly transitions and assumes the seat of President, such established course is now closed to COMMISSIONER COLLINS. She is now forced to forego both the personal achievement that such position would provide as well as the ability to promote the very core policies and programs that COMMISSIONER COLLINS has been cultivating over her twenty plus career of advocating for educational equity and opportunity. Collins Dec. ¶35.

COMMISSIONER COLLINS has incurred irreparable injuries on account of DEFENDANTS' actions which have crippled her ability to effectively advocate for her constituency which, in turn, have incurred their own irreparable injuries because of their elected official, COMMISSIONER COLLINS', severely diminished capacity to advance policies and programs that serve their particular needs. Collins Dec. ¶¶ 40, 41, 42, 45, 46. Given that an elected official is only allotted a finite and limited time frame within which to advance the policy agenda of his or her constituents, DEFENDANTS' action of stripping her of her Vice President position and committee assignments have irreparably disabled COMMISSIONER COLLINS' ability to fulfill the campaign objectives that the S.F. voters elected her to accomplish. This is most glaring for the Black and Brown members of COMMISSIONER COLLINS' constituency who were able to rely on COMMISSIONER COLLINS' leadership position to perhaps finally attain programs and realize policies that addressed their particular needs that have otherwise been ignored or disregarded. Collins Dec. ¶¶40, 41, 44.

Thus, no amount of money damages can substitute nor remedy such injuries, particularly given COMMISSIONER COLLINS' underlying passion and motivation for obtaining an elected School Board position. COMMISSIONER COLLINS specifically ran for membership to the School Board in order to solely manifest changes to an educational system that for over twenty years, she had been observing and working in to promote more equity, opportunity and inclusivity in its operation.

Lastly, the complete vilification of COMMISSIONER COLLINS' character and reputation that has resulted due to DEFENDANTS' actions is well beyond repair and is incomprehensible, given COMMISSIONER COLLINS' lifelong commitment and affirmative efforts to battle against racial oppression and injustice. Now, ironically, COMMISSIONER COLLINS has been incessantly slandered, bullied and defamed as a racist which, given the means by which contemporary society is publicly informed, such designation is not only a scarlet letter but a scarlet tattoo that is beyond erasure. Thus, by immediately restoring COMMISSIONER COLLINS to her previously held Board positions, this Court will be immensely contributing to the restoration of COMMISSIONER COLLINS' good name and reputation. Additionally, by this Court recognizing

and remediating DEFENDANTS' blatant violation of COMMISSIONER COLLINS' protected speech, the animosity and ostracization that she continues to face, both within her workplace and on the streets of San Francisco, will hopefully diminish, along with the well-founded fears that she now must unfortunately bear of physical and emotional harm to herself and her family. Collins Dec. ¶¶48(a), (b), (c).

In *Chalk v. United States Dist. Court Cent. Dist*. 840 F.2d 701(9th Cir. 1988), the defendant Orange County Department of Education reassigned plaintiff to a position that had no direct contact with students after it learned of plaintiff's AIDS diagnosis. *Id.* at 703. The district court denied plaintiff's motion for a preliminary injunction seeking reinstatement to his prior position. *Id.* The district court found that despite demonstrating a strong possibility of success on the merits, plaintiff was unable to show irreparable injury. *Id.* at 709. The evidence established that the plaintiff was still employed and making the same salary but had been reassigned to a position preparing grant proposals. *Id.*

In reversing, the Ninth Circuit held that the district court erroneously "focused on the monetary loss" to plaintiff. *Id.* The district court failed to take into consideration the loss plaintiff suffered from being reassigned from his position teaching hearing-impaired children in a small classroom setting which was a job for which he developed special skills beyond those normally required to become a teacher. *Id.* The district court failed to take into consideration the fact that plaintiff's "closeness to his students and his participation in their lives is a source of tremendous personal satisfaction and joy to him and of benefit to them." *Id.* The Ninth Circuit held that "[s]uch non-monetary deprivation is a substantial injury which the court was required to consider." *Id. See Finot v. Pasadena City Bd. of Educ*., 250 Cal. App. 2d 189, 202-03, 58 Cal. Rptr. 520, 529 (1967) (teacher's reassignment from classroom duty to home teaching, imposed in retaliation for an exercise of first amendment rights, was a "legally remediable detriment.")

In this case, while COMMISSIONER COLLINS is still an elected member of the S.F. School board, her leadership position and committee memberships provided her with an ability to partake in her role as a Board member that was qualitatively more productive and rewarding than serving without those responsibilities. While certain aspects of COMMISSIONER

COLLINS current job might be similar to how they were prior to DEFENDANTS' March 25, 2021 Resolution, the public censoring and stripping of titles and duties imposed expressly on account of COMMISSIONER COLLINS exercising her First Amendment speech is inarguably a 'demotion' and thus, a blight on her reputation, reasonably causing irreparable injury.  Given the likely duration of the present legal action, the proper course for the Court to take is to issue an order to show cause why the parties should not return to the status quo: their pre-Resolution No. 213-25A1 arrangements and appointments.

### 3.   The Balance of Hardships Tips In Favor of COMMISSIONER COLLINS

Having demonstrated a strong probability of success on the merits and the possibility of irreparable injury, COMMISSIONER COLLINS has shown all that is necessary for a preliminary injunction to issue. *Chalk,* 840 F.2d at 710.  However, since "at least a minimal tip in the balance of hardships must be found even when the strongest showing on the merits is made," *L.A. Coliseum*, 634 F.2d at 1203-04, the potential injury incurred by DEFENDANTS' must also be considered. DEFENDANTS cannot show any cognizable injury that will arise were COMMISSIONER COLLINS to resume her leadership and committee positions. COMMISSIONER COLLINS' Twitter comments were made in 2016 and were publicly available for all to see. This includes the voters who voted for her. COMMISSIONER COLLINS will remain on the School board for the remainder of her term and potentially another term if she chooses to run and is reelected. When returned to her prior positions, the only potential injury the Board could claim would be an increase in public comments regarding COMMISSIONER COLLINS during School board meetings, as well as conceivably some degree of heightened critical media attention. However, given COMMISSIONER COLLINS' probability of success on the merits and the speculative nature of DEFENDANTS' injuries, the injuries befalling COMMISSIONER COLLINS reasonably far outweigh those DEFENDANTS might conceivably incur. *Chalk,* 840 F.2d at 710. Simply put, were COMMISSIONER COLLINS to return to her leadership and committee positions, the operations of the School board would by no means be thwarted nor

fundamentally impacted and would quite conceivably serve as a catalyst for truth and reconciliation.

Moreover, if in fact COMMISSIONER COLLINS' comments rose to a level sufficient to disqualify her future participation as a School board member, the proper protocol for such disqualification is an electoral recall. The voters of San Francisco rather than members of the School board should determine whether comments made prior to COMMISSIONER COLLINS attaining elected office should suffice to render COMMISSIONER COLLINS ineligible and unfit for serving on the School board. The fact that individual Board members took COMMISSIONER COLLINS' speech as personally objectionable does not give them the right to usurp the will of the voters of San Francisco. Unless unequivocally rejected, such retaliation will chill COMMISSIONER COLLINS' future speech, as well as hastening a heightened potential of chilling the speech of elected officials overall within the City of San Francisco and beyond.

Finally, public interest is one of the traditional equitable criteria which a court should consider in granting injunctive relief. See *L.A. Coliseum*, 634 F.2d at 1200.  In this case, as referenced above, the public voted for COMMISSIONER COLLINS to serve on the School Board. If voters in San Francisco are concerned that COMMISSIONER COLLINS' speech rendered her unfit and unqualified to continue to carry out her duties on the School board, they should be the ones who make that decision through electoral means. The public interest factor weighs heavily in favor of COMMISSIONER COLLINS, as her public rebuke and censure at the hands of DEFENDANTS has effectively undermined and diminished COMMISSIONER COLLINS' capacity to represent her constituents' interests on account of her removal from the School Board's leadership position as well as her committee memberships. Such 'demotions,' along with the overall chilling effect on COMMISSIONER COLLINS' present and future speech due to DEFENDANTS' vehement and relentless response to COMMISSIONER COLLINS' past speech has greatly diminished her capacity to effectively serve her elected position. Thus, the public interest is gravely impacted and one that strongly tips in favor of placing COMMISSIONER COLLINS back into the positions she held prior the furor over her free speech that led DEFENDANTS to engage in facially constitutionally offensive conduct.

1        *Blair v. Bethel School Dist.*, 608 F.3d 540 (9th Cir. 2010) is distinguished from

2    COMMISSIONER COLLINS' case in three (3) major ways: First, unlike the plaintiff-appellant in

3    that case, stripped of his vice presidency position for making critical comments to a newspaper

4    reporter against the superintendent while on the board, here DEFENDANTS retaliated against

5    COMMISSIONER COLLINNS, punishing her for speech she made two (2) years before she was

6    elected to the Board, and three (3) years before the Board elected her as vice president. Secondly,

7    DEFENDANTS' Resolution slandered and personally attacked COMMISSIONER COLLINS as

8    a racist. No such parallel facts in Blair. Lastly, COMMISSIONER COLLINS' tweets were

9    unrelated to school Board business. Instead, COMMISSIONER COLLINS' speech related to

10   social and political advocacy, totally unrelated to any Board member or Board's actions.

11   Contrasting *Blair*, the plaintiff in *Blair* had consistently for years opposed extending the

12   employment contract of the superintendent. Again, no such board action was involved in

13   COMMISSIONER COLLINS' speech.

14       Similarly, the public interest has been further negatively impacted as COMMISSIONER

15   COLLINS' voice which elevated community discussion on how minority children were treating

16   each other within the school system was categorically silenced and rendered 'offensive' and

17   divisive.  While DEFENDANTS are free to have their personal opinions over COMMISSIONER

18   COLLINS' choice of words, it is reasonable to interpret her comments as ones intended to engage

19   and catalyze a necessary and long overdue dialogue about race, privilege and discrimination within

20   the school districts. Collins Dec. ¶¶24(1)-(12). COMMISSIONER COLLINS' words were

21   designed to initiate a discussion aimed at improving the lives and school experiences of all children

22   in the district. Id. With that voice now chilled and ostracized, along with expressing a more

23   tempered tone since being elected and functioning as a public servant as a School board member,

24   COMMISSIONER COLLINS' censure has most detrimentally impacted the public interest, as

25   equity and advocacy have most certainly been tainted and severely compromised.

26                     **IV.    CONCLUSION**

27       As set forth above, COMMISSIONER COLLINS has demonstrated a strong probability of

28   success on the merits and actuality of irreparable injury. Thus, the Court should issue an order to

MOTION FOR PRELIMINARY INJUCTION                          3:21-cv-02272-CRB

show cause why a preliminary injunction should not be granted that results in COMMISSIONER COLLINS' return to the positions and memberships she held prior to DEFENDANTS' adoption of its unconstitutional March 25, 2021 Resolution.  As discussed above, without the requested relief, COMMISSIONER COLLINS will suffer irreparable injury and harm.


DATED: May 26, 2021                    RESPECTFULLY SUBMITTED,

                                       **LAW OFFICES OF BONNER & BONNER**



                                       */s/ Charles A. Bonner*
                                       Charles A. Bonner
                                       ATTORNEY FOR PLAINTIFF